### UNITED STATES v. AMERICAN SOCIALIST SOC. et al.

#### (District Court, S. D. New York. March 18, 1919.)

1. ARMY AND NAVY ☜40—CORPORATIONS ARE WITHIN ESPIONAGE ACT.

   Corporations are within Espionage Act, tit. 1. § 3 (Comp. St. 1918, § 10212c), declaring a punishment for "whoever" in time of war willfully obstructs the recruiting or enlistment service.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Whoever.]

2. CORPORATIONS ☜526—CAN BE GUILTY OF SPECIFIC INTENT TO VIOLATE ESPIONAGE ACT.

   A corporation can be guilty of a specific intent involving an evil purpose to do a wrongful act, as to violate the Espionage Act.

3. ARMY AND NAVY ☜40—EVIDENCE SUSTAINING CONVICTION FOR OBSTRUCTING RECRUITING.

   Evidence held to warrant verdict that one defendant, in publishing and distributing a book, willfully obstructed the recruiting service, while at the same time acquitting the author.

Prosecution of the American Socialist Society and another for violation of the Espionage Act. On motions by defendant American Socialist Society (1) to set aside the verdict against said society and for a new trial, and (2) in arrest of judgment. Motions denied.

See, also, 252 Fed. 223.

Seymour Stedman, of Chicago, Ill., and Walter Nelles, I. M. Sackin, and S. John Block, all of New York City, for the motion.

Francis G. Caffey, U. S. Atty., and Earl B. Barnes, Asst. U. S. Atty., both of New York City.

MAYER, District Judge. American Socialist Society and one Nearing were tried on an indictment containing four counts, two for alleged conspiracies and two for alleged violations of section 3, title 1 of the Espionage Act (Act June 15, 1917, c. 30, 40 Stat. 219 [Comp. St. 1918, § 10212c]). The court dismissed the conspiracy counts and sent the remaining counts to the jury, which returned a verdict of not guilty in favor of Nearing and of guilty on both counts against defendant society.

On the coming in of the verdict, the court set aside the verdict on the third count and reserved decision on the motion in respect of the fourth count. The third count charged defendant with willfully attempting to cause insubordination, disloyalty, mutiny, and refusal to duty in the military or naval forces of the United States; but, in view of the court's construction of the language of the statute and

of the character of the acts necessary in that connection to prove, inter alia, intent to accomplish the serious results safeguarded against it was and is thought that the evidence did not justify the verdict as to this count. No further mention, therefore, need be made either of the third count or of that part of the statute the violation of which it charged.

The fourth count charged acts by both defendants alleged to have violated the following provision of section 3, title 1 of the Espionage Act, viz.:

"Whoever, when the United States is at war * * * shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service or of the United States, shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years, or both."

It was proved at the trial that Nearing wrote and the society published and distributed a pamphlet entitled "The Great Madness," but, as will appear infra, the part played by each was not the same. In order to convict, it was necessary to satisfy the jury beyond a reasonable doubt (1) that the effect of the pamphlet was to obstruct the recruiting and enlistment service and (2) that it was willfully intended so to do.

Various arguments were presented and requests to charge submitted on the propositions: (a) That obstruction meant physical obstruction, and not impeding, hindering, retarding, or putting an obstacle in the way of recruiting or enlisting, as defined in Masses Pub. Co. v. Patten, 246 Fed. 24, 158 C. C. A. 250, L. R. A. 1918C, 79, Ann. Cas. 1918B, 999; (b) that recruiting and enlistment service did not include those male persons between 18 and 40 who could volunteer (under the relevant statute) for service in the army and navy, but referred only to the military and naval recruiting officers and men; (c) that what defendants did was within their constitutional rights of free speech as secured by the First Amendment; and (d) generally, that the acts complained of represented a state of mind and an expression of opinion, rather than offenses denounced by the statute.

Since the trial, all these questions have been set at rest by the recent decisions of the United States Supreme Court in Schenck v. United States, 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470, Debs v. United States, 249 U. S. 211, 39 Sup. Ct. 252, 63 L. Ed. 566, and Frohwerk v. United States, 249 U. S. 204, 39 Sup. Ct. 249, 63 L. Ed. 561. At the time of the trial there was a diversity of opinion in the courts as to whether the recruiting and enlistment service included those subject to the Selective Service Law (Act May 18, 1917, c. 15, 40 Stat. 76 [Comp. St. 1918, §§ 2044a–2044k]), as well as volunteers, and, as the court, giving the defendants the benefit of the doubt as to the law, charged the jury to confine its consideration to the effect of the pamphlet on those contemplating volunteering and to exclude those subject to the draft, the charge was more favorable to defendants in that regard than the recent decisions supra seem to require.

Thus, the instructions as to the law were well within the authoritative holdings of the United States Supreme Court, and the pam-

phlet was such that the jury was well justified in deciding, as matter of fact, that its effect was to obstruct the recruiting and enlistment service of the United States within the meaning of the statute.

The remaining question is whether the evidence supported the conclusion of the jury that defendant society published and distributed "The Great Madness" with the specific intent of violating the statute.

[1] Preliminarily, it is contended that the word "whoever" refers only to human beings and not to corporations. This point may be speedily disposed of (1) because the word has been construed by courts as including corporations (40 Cyc. 928, and cases cited); and (2) because the obvious intent of the Congress was to reach corporations as well as individuals who did the acts prohibited by the Espionage Law. It is difficult to imagine that, in enacting a statute deemed necessary and vital for the protection of the country when at war, and in realizing that dangerous violations could be accomplished by publications issued and distributed by persons operating in corporate form, the Congress intended to let such corporations escape the consequences of their acts, while it held individuals to strict responsibility for precisely similar acts.

[2] It is contended, further, that a corporation cannot be guilty of a specific intent where such intent involves an evil purpose to do a wrongful act; but that contention successfully made in the earlier history of the law and, indeed, until comparatively recent times, has now been fully discarded, and it is sufficient to refer to three decisions, one by the Supreme Court of the United States, and the other two by courts of high authority, which effectually dispose of the argument that a corporation cannot form and manifest the intent to violate a statute such as that now under consideration. N. Y. Central R. R. Co. v. United States, 212 U. S. 481, 29 Sup. Ct. 304, 53 L. Ed. 613; People v. Rochester Ry. & L. Co., 195 N. Y. 102, 88 N. E. 22, 21 L. R. A. (N. S.) 998, 133 Am. St. Rep. 770, 16 Ann. Cas. 837; Telegram Newspaper Co. v. Commonwealth, 172 Mass. 294, 52 N. E. 445, 44 L. R. A. 159, 70 Am. St. Rep. 280.

[3] The sole remaining question which calls for comment is that which is concerned with the suggested inconsistency of the verdict; i. e., the verdict of guilt against the publisher and distributer on the same counts on which the author was acquitted. As matter of law, such a verdict does not per se afford grounds for a new trial. As stated in 16 C. J. 1176:

"The fact that the verdict was rendered only after long consideration and was apparently the result of a compromise is not ground for a new trial, where there is no showing that it was obtained improperly."

Counsel for defendants fairly and frankly agree with this proposition for in their brief they state:

"We do not urge as a matter of law that there is an obligation upon the court to see that an inconsistent verdict should not stand."

Their position is that they "advance the proposition as one of simple justice." It is desirable, therefore, that some of the essentials of the situation shall be outlined and made clear because in cases of

this character it is almost as important that the result shall be believed to be just as that it shall be just.

In indictments for crime, where human beings are jointly tried with corporations, the human interest naturally centers around the living individual. During a trial the corporation is a sort of abstraction, and seems rather a secondary figure. The human being may lose his liberty if convicted, while the worst that can happen to the corporation is the imposition of a fine. When, therefore, the jury rendered its verdict, the first impression was one of inconsistency and compromise. Yet the events of the trial and the extended deliberation of the jury invited a careful analysis in order to ascertain, not only as matter of law, but also, as counsel have put it, as matter of simple justice, whether the verdict should stand. The jury had been out for nearly 30 hours and away from home overnight, and yet, during this long period, it had not once requested to be discharged, nor once—as is not infrequently the case to the contrary—informed the court that it was unable to agree. Certainly, no jury could have been more conscientious in seeking to arrive at a conclusion. Nearing had taken the stand and subjected himself to examination and cross-examination. He had insisted that, whether his views were right or wrong, he had not intended to obstruct recruiting and enlistment; that his personal history and career were such that he had never failed to do by direct appeal what, from his point of view, he thought he ought to do; that in writing the pamphlet he had wished to show that war was wrong, and that this war in particular was wrong, and that the propositions put forth in the pamphlet were consistent with his writings on economic subjects, both before and during the war.

From the evidence it appeared that he did not join defendant society until after his pamphlet was submitted and first published, and that he had no part either in the detail of publication or of distribution, nor in the plan of defendant society to publish and distribute publications hereinafter referred to, directed against the war and its prosecution by the United States. All this, with other testimony unnecessary to recite in detail, presented a question of fact to the jury, i. e., whether Nearing intended to obstruct the recruiting and enlistment service, and this it could decide either way.

The same question of fact was presented to the jury in respect of the defendant society, but on a very different state of facts. The American Socialist Society is a membership corporation organized under the laws of the state of New York. Its objects are stated in the by-laws to be:

"To promote social intercourse and friendship between its members, to study and discuss political science, to expound the theories of modern socialism by lectures and publications, to conduct a school, reading rooms, library, and clubhouse, and to do such other things and engage in such other enterprises as are calculated to promote the principal objects of the society."

The membership is confined as follows:

"Only persons who formally declare themselves in full accord with the principles and tactics of the modern Socialist movement shall be eligible to membership."

Under the by-laws, the society has an annual meeting in February and regular membership meetings in May, September, and December. There is a board of directors, consisting of nine members, and the powers of the board are thus defined in section 5 of the by-laws:

"The board of directors shall carry out the orders and resolutions of the society, manage its executive affairs, see to the proper investment of its funds, supervise and direct the officers in the performance of their duties, hire and engage employés and fix their salaries, appoint standing or special committees, and submit reports of their proceedings and of the affairs of the society to all regular meetings of the membership."

The society has the usual complement of officers. This society has become known, through the name of its school, as the Rand School of Social Science, and it also conducts a bookstore known as the Rand School Bookstore. The society sells books on general literature and also on political and economic subjects, including writings of various kinds, both advocating and opposing Socialism and its doctrines. In addition, from time to time, the society publishes pamphlets, which it sells and distributes.

In order to understand the testimony in the case at bar, the sequence of events should be remembered:

On April 6, 1917, the United States declared war against the Imperial German government. At the national convention of the Socialist Party at St. Louis, held April 7 to 14, 1917, there was passed what has been called the "majority resolution," which was, in effect, an anti-war resolution, the details whereof need not be set forth at length. Part of the program of the Socialist Party was "resistance to compulsory military training and to the conscription of life and labor." On May 18, 1917, the Selective Service Law was passed, and on June 5, 1917, registration was had throughout the country, in respect of all those persons subject to the act. On June 15, 1917, the Espionage Law was passed. Between the time the Selective Service Law was passed and the time the Espionage Law was passed, to wit, on June 6, 1917, an authorized committee of defendant society, known as the "publication committee," according to the minutes of the board of directors, made the following report:

"The publication committee reported that they had decided to print the following three pamphlets:
"1. On the position of the party with reference to the war.
"2. On the Russian Revolution.
"3. On militarism.
"The report was approved."

After this report had been made, three pamphlets were published and distributed by defendant society. They were entitled "The American Socialists and the War." "The Menace of Militarism," and "The Great Madness." The first-named pamphlet was edited by the director of the department of labor research of the Rand School of Social Science, and preceded by an introduction by Morris Hillquit, a member of defendant society and the international secretary of the Socialist Party.

The position of the Socialist Party at St. Louis was approved in Hillquit's introduction, and all three pamphlets set forth in extenso denunciations of the war and of the part which the United States had undertaken. Other publications of defendant society, such as the Catalogue at the Rand Bookstore and the Bulletin for 1917 and 1918, reiterated in one form or another some or all of the positions taken in the three pamphlets above referred to.

In August, 1917, according to the testimony, the manuscript of The Great Madness was found in a desk in the Rand School and the evidence is that at one time or another one Karp, the manager of the bookstore; Cohen, the chairman of the publication committee, and Mrs. Mailly, the executive secretary of the Rand School, saw the manuscript prior to publication. The manuscript was published by authority of the defendant society acting through the officers and agents to whom such matters were officially confided in the ordinary conduct of the affairs of the society. Each of those who saw the manuscript testified in one way or another that he or she did not fully read the same, but it appeared from the testimony that any article or pamphlet by Nearing would be published and that the active and responsible officers and agents of defendant Society were fully conversant with Nearing's views, in respect of the war. The first edition of 10,000 copies of The Great Madness was published and paid for in September, 1917, and a second edition of 10,000 copies was published and paid for in October, 1917. The pamphlet was sent to various Socialist local organizations and to bookstores or distributers, and was also sold over the counter at the Rand School in the city of New York. Of the 20,000 which were printed, the testimony showed that some 19,000 had been distributed and had gone into general circulation.

During the summer and early fall of 1917, pending the working out of the elaborate detail of the Selective Service Law, it will be remembered that the government was straining every effort to obtain as many recruits and volunteers as possible. It is a matter of common knowledge that recruiting stations were established, posters extensively distributed, public meetings widely held, and a nation-wide appeal made to men of enlistment age, to enlist in the army and navy. It was while that situation was prevailing that The Great Madness was published and distributed.

At the February, 1918, meeting of defendant society the publication committee reported the publication of two pamphlets by Nearing, and, on the evidence, these pamphlets unquestionably were The Menace of Militarism and The Great Madness. In the Year Book, which defendant published early in 1918, the position taken by the majority resolution of the Socialist Party at St. Louis was strongly approved in the following language:

"The American Socialist Party was never confronted with so grave a crisis as that which it faced in St. Louis. That the crisis was faced bravely and without flinching is a tribute to the courage and clear-sightedness of the delegates. That the stand taken at St. Louis was the right one is evidenced by the tremendous enthusiasm evoked by the decision of the convention, and by the extraordinary growth of the party since April."

From the foregoing, and more to the same effect, which will be found in the testimony, the jury had the right to conclude that on the part of the society there was a plan and program whereby its anti-war attitude in various aspects should be consistently and persistently expressed by means, among other things, of the publication and distribution of pamphlets, and this was all the more plain because, in the main, defendant society was concerned more with the sale than with the publication and distribution of writings.

The jury was instructed, in effect, that the principles of the Socialist Party were not under consideration, and that its sole duty was to ascertain whether or no defendants were guilty of the offenses charged beyond a reasonable doubt. A brief extract from the charge is as follows:

"With the principles of the Socialist Party you have no concern any more than the court. Those principles may be, so far as they deal with economic and philosophic questions, right or wrong. With them we are not concerned. But you have a right to look at these various previously issued documents, to see what was in the mind of both of the defendants, what was there concerning them, so far as the war situation was involved, in order to determine whether or not, when Nearing wrote 'The Great Madness,' it was his purpose to violate the statute, and, when the corporation printed and published it, it was its purpose to violate the statute. Now, that is for you to determine."

In Debs v. United States, supra, Mr. Justice Holmes, speaking for the United States Supreme Court, said:

"The main theme of the speech was Socialism, its growth, and a prophecy of its ultimate success. With that we have nothing to do, but if a part or the manifest intent of the more general utterances was to encourage those present to obstruct the recruiting service, and if in passages such encouragement was directly given, the immunity of the general theme may not be enough to protect the speech."

The jury was also charged, in accordance with familiar principles, that every one is presumed to intend the natural and probable consequences of his own act, and, when any one does any particular act, he is presumed to intend the natural and probable consequences of that act. In Debs v. United States, supra, in commenting upon the speech of the defendant in that case, the court stated:

"The statement was not necessary to warrant the jury in finding that one purpose of the speech, whether incidental or not does not matter, was to oppose not only war in general but this war, and that the opposition was so expressed that its natural and intended effect would be to obstruct recruiting. If that was intended, and if, in all the circumstances, that would be its probable effect, it would not be protected by reason of its being part of a general program and expressions of a general and conscientious belief."

And in Schenck v. United States, supra, the court held:

"We admit that in many places and in ordinary times the defendants, in saying all that was said in the circular, would have been within their constitutional rights. But the character of every act depends upon the circumstances in which it is done. Aikens v. Wisconsin, 195 U. S. 194, 205, 206, 25 Sup. Ct. 3, 49 L. Ed. 154. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force. Gompers v. Bucks Stove & Range Co.,

221 U. S. 418, 439, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874. The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight, and that no court could regard them as protected by any constitutional right."

In the case at bar, the instructions which went to the question of intent were of the same character and at times almost in the same words as those upheld in the recent decisions of the Supreme Court, and the evidence was ample to sustain the finding of the jury and to authorize the jury in differentiating on the evidence between the case of defendant society and the case of the individual defendant. The jury was charged that it was at liberty to acquit both defendants on the counts submitted, or to acquit one and convict the other. The jury has made its decision, and I find nothing in the record which would justify the setting aside of the verdict against defendant on the fourth count, either as matter of law or, to use counsel's phrase, as matter of simple justice.

The case was tried by able counsel on both sides with courtesy, clearness, and force. There were no digressions to lead the jury into strange paths. The fundamental questions involved were repeatedly stated both by court and counsel, and there can be no doubt that the jury was fully possessed of the controversy and understood perfectly the duty which it was called upon to perform. It could have decided either way, and, having decided as it did on the evidence and the law, it is the duty of the court to sustain the verdict.

The motions, therefore, must be denied.

NOTE.—The date for sentence is set for March 21, at 2 p. m., in Room 235, Post Office Building. A reasonable stay will be granted, so as to give counsel for defendants an opportunity, if so advised, to submit a proposed writ of error in connection with the bill of exceptions, and the writ of error will be allowed, if presented.