# Criminal Liability for Newspaper Publication of Naval Secrets

*A reporter who kept or copied a Navy dispatch containing a list of Japanese ships expected to take part in an upcoming naval battle, and later submitted for publication a newspaper article with information from the dispatch, appears to have violated sections 1(b) and 1(d) of the Espionage Act, but it is doubtful he violated sections 1(a) and 2.*

*Whether the managing editor and publisher of the newspaper that published the article might also be criminally liable under the Espionage Act depends on their intent and knowledge of the facts.*

June 16, 1942

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

You have inquired concerning the legal implications of a state of facts which may be summarized as follows:

*A*, a reporter permitted to travel with the Pacific fleet, picked up a dispatch on the desk of an officer on a battleship, and discovered that it contained a list of Japanese ships taking part in a certain naval engagement. He either kept the dispatch or copied it. Later, he returned to San Francisco by airplane. On landing, he wrote a story about the engagement, in which he used the information contained in the dispatch. This dispatch was wired to the *B* newspaper, in Chicago, and certain other newspapers in other cities, including the *C* paper in Washington, D.C.

The publication of the story in these papers, although not effected until several days after the naval battle, resulted in important advantages to the Japanese, who thus became aware of the efficiency of our naval intelligence. Certain additional facts appear in the course of the discussion.

Among the substantive questions presented are:

(1) Has *A* violated the Espionage Act of 1917[1]?

(2) Has the managing editor of *B* newspaper violated the Act?

(3) Has the corporation owning the *B* newspaper violated the Act?

(4) Has the person described as the "publisher" of the *B* newspaper violated the Act, assuming that he owns a large fraction of the corporation's stock and controls its general policies?

Questions of venue also arise. These will be treated in a separate memorandum.[*]

---

[1] Act of June 15, 1917, ch. 30, 40 Stat. 217, *codified at* 50 U.S.C. §§ 31 *et seq.* (1940).

[*] Editor's Note: That memorandum opinion follows this one in this volume (*Trials of Newspaper Personnel Accused of Disclosing Naval Secrets*, 1 Op. O.L.C. Supp. 102 (June 16, 1942)).

The answers to these questions appear, in brief, to be as follows:

(1) *A*, the reporter, appears to have violated the Espionage Act of 1917.

(2) Whether the managing editor of *B* newspaper has violated the Act depends on his intent and knowledge of the facts.

(3) If the managing editor has violated the Act, it would seem that the publishing corporation has also violated it.

(4) Whether the person described as the "publisher" of the *B* news-paper has violated the Act would seem to depend on his intent and knowledge of the facts.

## I. The Reporter Appears to Have Violated the Espionage Act, in Wrongfully Taking or Copying the Dispatch

The Espionage Act of 1917, section 1, provides in part as follows:

(a) Whoever, for the purpose of obtaining information respecting the national defense with intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation, goes upon, enters, flies over, or otherwise obtains information concerning any vessel, aircraft, work of defense, navy yard, naval station, submarine base, coaling station, fort, battery, torpedo station, dockyard, canal, railroad, arsenal, camp, factory, mine, telegraph, telephone, wireless, or signal station, building, office, or other place connected with the national defense, owned or constructed, or in progress of construction by the United States or under the control of the United States, or of any of its offic-ers or agents, or within the exclusive jurisdiction of the United States, or any place in which any vessel, aircraft, arms, munitions, or other materials or instruments for use in time of war are being made, prepared, repaired, or stored, under any contract or agreement with the United States, or with any person on behalf of the United States, or otherwise on behalf of the United States, or any prohibited place within the meaning of section 36 of this title; or

(b) whoever, for the purpose aforesaid, and with like intent or reason to believe, copies, takes, makes, or obtains, or attempts, or induces or aids another to copy, take, make, or obtain, any sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, ap-

pliance, document, writing, or note of anything connected with the national defense . . .

shall be punished by imprisonment for not more than ten years and may, in the discretion of the court, be fined not more than $10,000.

50 U.S.C. § 31.

In the instant case, there is doubt whether section 1(a) applies: the reporter has not attempted to obtain information about vessels of the United States, but only concerning vessels of the Japanese Navy.

Section 1(b) seems more directly applicable: there certainly has been a "taking or a copying" of a "writing" connected with the "national defense." Under this subsection, a writing which lists ships of an enemy nation does not by reason of that fact become unconnected with the national defense. The dispatch is intimately connected with defense, as is shown by the fact that if it had been lost or stolen before the beginning of the battle the consequences to the national defense might have been disastrous.

Was the reporter's act motivated by the requisite intent? Under section 1(b), as under section 1(a), an act is criminal only if the accused acted "for the purpose of obtaining information respecting the national defense with intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation."

Thus, there must be a *purpose* to obtain information respecting the national defense. This purpose seems clearly present. While the information relates to the state of our Navy's knowledge of Japanese plans, rather than to our own vessels and strategy, it nevertheless is information "respecting the national defense." There must also be "intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation." That there was a specific intent of this nature is doubtful. That there was "reason to believe" seems fairly apparent, though the facts are not completely known to me. The reporter was skilled in naval matters, as shown by his ability to understand the dispatch, which was couched in technical terms. The information was obviously secret. He did not submit his story to the naval censors, but waited until he was on American soil before sending it in. He might have thought that the story of a battle which had been fought several days earlier would not be prejudicial to our defense; he may simply have kept silence in order to be sure of a "scoop." But a person in his position should have realized that the information contained in the dispatch had been obtained by the naval intelligence in some remarkably efficient manner: it should have been clear to him that revealing the text or substance of the dispatch would jeopardize the method by which this information had been gathered. It is true that some of this information might have been gathered by scouting planes, but it is understood that data of the degree of completeness here present could not have been so gathered. It is also true that a

complete story might have been sent out after the battle: but it is understood that this dispatch was sent prior to the battle, and revealed in advance the entire disposition of the Japanese forces.

The reporter's conduct in taking and copying a dispatch of immense importance—as this one seems obviously to have been—is characterized by real turpitude and disregard of his obligations as a citizen. It is hard to believe that any jury or judge would take a sympathetic view of his case, or seek to free him on any narrow view of the facts of the law. He thoroughly deserves punishment.

## II. The Reporter Appears to Have Violated Section 1(d) of the Espionage Act in Transmitting the Information For Publication

Section 1(d) of the Espionage Act provides:

> [W]hoever, lawfully or unlawfully having possession of, access to, control over, or being intrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, willfully communicates or transmits or attempts to communicate or transmit the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it . . . shall be punished by imprisonment for not more than ten years and may, in the discretion of the court, be fined not more than $10,000.

50 U.S.C. § 31(d).

To bring the reporter within the compass of this statute, four things must be shown:

> (1) That the reporter had "possession of, access to, control over" or was entrusted with a document or similar item;

> (2) That he communicated the document (or perhaps information therein contained);

> (3) That the communication was to persons not entitled to receive it; and

> (4) That his communication was "willful."

The answers to these points appear to be as follows:

1. The reporter clearly had "access" to a document of the stated character.

2. The statute speaks in terms of communicating or transmitting a document. Does this extend to communicating the substance of a document, or information contained in it? The legislative history of section 1(d) is not particularly enlightening on this point. The section as originally drawn contained the words "or information" at the end of the list of items covered (document, writing, etc.). These words were stricken out, though the debate indicates no intention to weaken the section by so doing. *See* 55 Cong. Rec. 778 (1917). The section should be held to cover the communication of information in a case where such information closely parallels the contents of a document, and gives its gist or substance.

3. Section 1(d) does not define "persons not entitled to receive." In the original bill, this expression was implemented by a separate section, which gave the President power to define the classes of persons entitled to receive defense documents. This section was stricken by Congress, as being a grant of dictatorial power, and the meaning of "persons not entitled" was left in some doubt. Certain persons—such as representatives of enemy powers—are clearly "not entitled to receive." On the other hand, American citizens may be presumed to be entitled to information about their government and its acts; it is fairly arguable that limitations should be found in express legislation rather than in the court's ideas of desirable policy in the individual case. But in this case it seems clear that the general public was "not entitled to receive" the facts disclosed, and that the enormous circulation of the newspapers in question made it practically certain that the story would reach the enemy.

4. Was the reporter's communication "willful," within the meaning of section 1(d)? It certainly was, if the statute merely means "intentional." Yet it may mean more than that. Section 1(d) requires no specific intent. Further, it sets a rather vague standard: the document must relate "to the national defense"—a term which is not defined. A similar standard is set in section 1(b), which refers to copying plans "connected with the national defense." The Supreme Court, in interpreting section 1(b), has indicated that this standard is so vague as to be unenforceable, except in cases where the defendant's purpose is so clearly evil that he needs no warning. *Gorin v. United States*, 312 U.S. 19 (1941). In that case, the defendant knew that he was supplying valuable defense information to a foreign power, and the court held that this purpose was so evil as to preclude reliance on the vagueness of the statute. Similarly, in this case, the vast circulation of the newspapers involved puts the reporter in a position where he must pause and consider the consequences of his act. At best, his conduct was reckless and negligent, rather than specifically intended to do harm. Yet the negligence and recklessness were of such magnitude as to be fairly characterized as criminal and evil within the meaning of the *Gorin* rule.

### III. Whether the Reporter Has Violated Section 2 of the
### Espionage Act Appears Doubtful

Section 2 of the Act provides:

> Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to, or aids or induces another to, communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by imprisonment for not more than twenty years: *Provided*, That whoever shall violate the provisions of subsection (a) of this section in time of war shall be punished by death or by imprisonment for not more than thirty years; and (b) whoever, in time of war, with intent that the same shall be communicated to the enemy, shall collect, record, publish, or communicate, or attempt to elicit any information with respect to the movement, numbers, description, condition, or disposition of any of the armed forces, ships, aircraft, or war materials of the United States, or with respect to the plans or conduct, or supposed plans or conduct of any naval or military operations, or with respect to any works or measures undertaken for or connected with, or intended for the fortification or defense of any place, or any other information relating to the public defense, which might be useful to the enemy, shall be punished by death or by imprisonment for not more than thirty years.

50 U.S.C. § 32.

The reporter has violated section 2(a) if he intended his story to reach the enemy, and had reason to believe that the enemy would be aided or the United States injured. The heavy penalty imposed may indicate that the statute was not intended to apply unless the defendant's *mens rea* is clear.

Section 2(b) is unique, in that it is the only statute relating to espionage which uses the word "publish." The intent required is that the information "shall be communicated to the enemy." This subsection is also likely to receive a narrow construction, in view of the severe penalties provided.

## IV. The Liability of the Managing Editor of *B* Newspaper

The editor of *B* newspaper may perhaps have directed the reporter to obtain information in every possible way—including the taking or copying of secret documents—without permission. If so, he might perhaps be indicted for conspiracy to violate section 1(a) or 1(b). It is not known whether such facts could be proved in the present case.

On the question of the editor's liability for his part in *communicating* the information to the public, we must look once more at section 1(d). Here, again, we have four inquiries:

(1) Did the editor have "possession of" or "access to" a document?

(2) Did he "communicate" or "transmit" the document?

(3) Did he communicate it to "persons not entitled to receive it"?

(4) Was his communication "willful"?

These questions can probably be answered in the affirmative if the editor can be shown to have realized that the story he received was the gist or substance of a document of the type described in the statute. If he realized this, then his passing the story to the public would seem to be the intentional transmittal of a document. Whether the transmittal can be classed as "willful" depends on the meaning to be attached to that word, as it is used in the statute. It may mean merely "not accidental," or may mean "with a sense of realization of wrongdoing." Under the *Gorin* case, discussed above, the courts will probably read the latter meaning into the statute. It would thus appear to be necessary to prove, in effect, a conspiracy between the reporter and the editor to violate section 1(d), by the intentional transmission of the contents of a secret document to persons not entitled to receive it, with full realization of the evil character of the act—or at least with such recklessness and wantonness as to indicate an equally criminal mentality.

Whether the editor can be convicted under section 2 of the Act would appear to rest on considerations similar to those discussed in Part III of this memorandum.

## V. The Liability of the Corporation Publishing *B* Newspaper

The corporation's liability would seem to depend on the liability of the managing editor: if he can be convicted, so also can the company. His criminality, if proved, can be fastened on the corporation which hired him, which put his act into effect, and which made a profit from it.

It is true that section 1(d) speaks of "whoever . . . willfully communicates," thus using a personal term and imposing a requirement of intent. Yet this does not render a corporation incapable of committing the crime. Construing section 3 of

the same statute, which condemns "[w]hoever . . . shall willfully obstruct . . . recruiting," 50 U.S.C. § 33, Judge Mayer held that a corporation which published a seditious pamphlet could be convicted and fined. *United States v. Am. Socialist Soc.*, 260 F. 885 (S.D.N.Y. 1919), *aff'd*, *Am. Socialist Soc. v. United States*, 266 F. 212 (2d Cir. 1920), *cert. denied*, 254 U.S. 637 (1920).

## VI. The Liability of the Person Described as "Publisher" of *B* Newspaper

It is assumed that the person described as "publisher" owns a substantial fraction of the stock of the corporation which publishes *B* newspaper, and that he controls its general policies.

The most obvious grounds for holding the publisher are similar to those discussed in connection with the petition of the managing editor, i.e.,

(1) Possible liability for directing the illegal obtaining or copying of the document, under sections 1(a) and 1(b).

(2) Possible liability for willfully transmitting the contents of the document to "persons not entitled to receive," under section 1(d).

(3) Possible liability for communicating information to the enemy, under section 2.

As to these grounds, the position of the publisher is similar to that of the editor, and like problems of proving knowledge, intent and *mens rea* arise.

If it is not possible to prove that the publisher knew about the story in advance of its publication, and that he willfully communicated it in violation of one of the statutory sections above mentioned, can he be held on some other ground? Can he be held criminally liable on the ground, for example, that he was negligent in failing to supervise the paper, or in choosing reckless reporters and editors? Or on the ground that if the corporation is held criminally liable the person controlling it should also be held?

While limitations of time have not permitted a complete investigation of these problems, it would appear that liability of this vicarious nature has seldom been imposed on stockholders and directors of corporations. Where the stockholder or director has directly participated in the crime—knowingly using the company as his tool—there is no difficulty in holding him. Occasionally, too, a statute will penalize someone who "permits" a nuisance or other criminal condition to exist: in such case, an officer or stockholder may be directly held for his criminal act of permission. This is a matter of statutory interpretation. *See generally* Frederic P. Lee, *Corporate Criminal Liability*, 28 Colum. L. Rev. 1 (1928).

Fletcher states:

At common law, the managing editor of a newspaper is criminally responsible for an unlawful publication made in the paper unless it was made under such circumstances as to negative any presumption of privity or connivance or want of ordinary precaution on his part to prevent it, and statutes sometimes provide that every editor or proprietor of a book, newspaper or serial, and every manager of a corporation by which any newspaper is issued is chargeable with the publication of any matter contained therein. But the business or circulation manager of a newspaper who has no editorial duties and no part in editing or producing it, but only circulates or distributes it, is not criminally liable at common law for the insertion of matter in the paper.

3 William Meade Fletcher, *Cyclopedia of the Law of Private Corporations* § 1350 (rev. & perm. ed. 1931).

This doctrine probably does not extend to a newspaper publisher whose proprietary interest is represented by stock ownership, and who leaves the active running of the paper to his managing editor. The Espionage Act is not written in terms to apply to publication or to newspapers, and no special terminology can be found in it to relieve the prosecution from the necessity of showing the required personal intent in the case of a newspaper publisher as with every other class of person. However, a further study will be made of this problem.

OSCAR S. COX
*Assistant Solicitor General*
