JOSHUA LEVERING ET AL., COMMITTEE OF THE LORD'S
DAY ALLIANCE, ET AL.,

*vs.*

GEORGE WEEMS WILLIAMS, GEORGE WASHING-
TON WILLIAMS, J. COOKMAN BOYD AND
EDWARD HANLON, CONSTITUTING THE
BOARD OF PARK COMMISSIONERS.

*Mandamus: to enforce public duty.   Police powers: may not
contravene general law.   Ordinances: validity; consid-
ered by what might be done under them.   Ordi-
nance permitting baseball.   Sunday laws.*

Private persons may move for a mandamus to enforce a pub-
lic duty due to the government as such, without the interven-
tion of a government law officer.                    p. 59

The broad and comprehensive police powers conferred upon
the City of Baltimore must not directly nor indirectly contra-
vene the general law.                              p. 53

In passing upon the validity of ordinances, courts are to be
controlled by what may be done under their authority, and not
merely by what has been done.                        p. 53

Ordinance No. 353 of the Mayor and City Council of Balti-
more, passed on the 25th day of March, 1918, would permit the
playing of baseball and other games on Sunday, by profes-
sionals or others hired for the purpose, and whose occupation
and employment is the playing of such games, and is in con-
travention of Section 436 of Article 27 of the Code, prohibiting
work and bodily labor on Sunday, and is void.         pp. 54-59

Under the power conferred upon the Park Board of Baltimore City by the Charter, they have no authority to pass rules or regulations contrary to the statutory law of the State.

pp. 60-61

*Decided February 13th, 1919.*

Appeal from the Superior Court of Baltimore City. (DAWKINS, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BURKE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Isaac Lobe Straus,* for the appellants.

*George R. Gaither* and *Oscar Leser* (with whom were *Robert F. Leach, Jr., Assistant City Solicitor,* and *Eli Frank* on the brief), for the appellees.

THOMAS, J., delivered the opinion of the Court.

On the 25th of May, 1918, the Mayor and City Council of Baltimore passed the following ordinance, known as Ordinance No. 353, and entitled

"An ordinance to repeal and reordain, with amendments Section 3 of Article 31 of the Baltimore City Code, title 'Sabbath.'

"Section 1. *Be it ordained by the Mayor and City Council of Baltimore,* That Section 3 of Article 31 of the Baltimore City Code, title 'Sabbath,' be and the same is hereby repealed and reordained so as to read as follows:

"Section 3. (A) Every person who shall fish or hunt or who shall play ball or any other game whatsoever on the Sabbath Day, commonly called Sunday, within the limits of Baltimore City, except as hereinafter authorized, shall for each offense pay a fine of one dollar; and every ordinary or public garden keeper who shall suffer or allow in or upon his premises any

kind of gaming or sport on the Sabbath Day, shall for every individual so permitted to offend, pay ten dollars.

"(B)  Nothing in this ordinance, however, shall be construed as prohibiting or penalizing the playing in the public parks, private parks on the grounds of organized or incorporated clubs and on open lots on Sunday of the games of baseball, golf, lawn tennis, croquet, basketball, football, lacrosse, quoits, soccer and field and track exercises; provided that any of the games enumerated in this paragraph '(B)' are played on Sunday between the hours of 2 P. M. and 7 P. M.; and provided further that such games are played in neighborhoods where they shall not cause a disturbance of the public peace; and provided that such games shall not be played within one hundred (100) yards of any place of worship where services are being held; and provided further that no admission fee whatsoever to such games shall be charged.

"In the event a person violates any of the aforesaid provisions of this paragraph '(B)' he shall be deemed guilty of a misdemeanor, and for each and every offense thereof, he shall be subject to a fine of from five to five hundred dollars, the said fine to be collected as other fines are.

"(C)  And nothing in this ordinance shall be construed as prohibiting or penalizing the playing of any games of golf, lawn tennis, croquet or quoits at any time on Sunday, provided such games be played on private grounds with the consent of the owner or custodian of such grounds, and for exercise or recreation only, and that not more than four persons play together in such game, and that such game be not played within one hundred yards of any place of worship where services are being held, and be not so played as to cause a disturbance of the public peace, and that no person who may be permitted to see such a game be charged any fee for such privilege; the meaning of the words 'private grounds,' as herein used being grounds which are privately owned as distinguished from grounds

which are publicly owned or which have been dedi-
cated to public use.

"Section 2. *And be it further ordained,* That this
ordinance shall take effect from the date of its pas-
sage."

Thereafter, on the 30th of May, 1918, the Board of Park
Commissioners of Baltimore City passed the following reso-
lution or regulation in reference to the playing of athletic
games in the public parks of Baltimore City on Sunday:

"*Resolved,* That such athletic games as are permit-
ted to be played in the public parks of Baltimore City
on weekdays shall be permitted to be played on Sun-
days between the hours of 2 and 7 P. M."

On the 1st of June, 1918, Joshua Levering, John T. Stone
and Rev. William W. Davis, constituting a Committee of the
Lord's Day Alliance, a body corporate, and as individuals and
taxpayers of Baltimore City, together with several other tax-
payers of Baltimore City, filed a petition in the Superior
Court of Baltimore City against George Weems Williams,
George Washington Williams, J. Cookman Boyd and Edward
Hanlon, constituting the Board of Park Commissioners of
Baltimore City, alleging among other things that said ordi-
nance and resolution are illegal and void because they contra-
vene the "general laws of the State of Maryland relating to
the observance of the Lord's Day, commonly called Sunday,
as a day of rest and worship," as codified in Article 27, sec-
tions 436-438 of Bagby's Code of Public General Laws of
Maryland, and praying for a writ of mandamus "directed
to" the said Board of Park Commissioners, and each of the
members thereof,

"preventing and restraining them and it from giving
effect to, permitting or directing the carrying out,
execution or effectuation of said alleged Ordinance
Number 353 aforesaid, and said Resolution, Order and
Regulation in said parks of Baltimore City upon or
during the Sabbath Day or Lord's Day, commonly

called Sunday, at any time hereafter, and preventing and restraining them from permitting, authorizing or directing the holding, carrying on or taking place of any of the said games, sports and athletic contests and exercises aforesaid, in said parks on the Sabbath Day or the Lord's Day, commonly called Sunday, at any time hereafter, and commanding and requiring them fully and in all respects to observe, abide by and give effect to the said Sections 436-438 of Article 27 of the Annotated Code of Maryland of 1914 edited by George P. Bagby, Esq., in said parks upon said Sabbath Day or Lord's Day, hereafter, without regard to the provisions of said alleged Ordinance Number 353 or any other provisions thereof, and ordering such other and further relief as may be proper in the premises."

The defendants answered the petition, admitting the passage of said ordinance and resolution, and alleging that the ordinance and resolution are valid, and that the games and privileges thereby permitted "will not in any manner interfere with the proper observance of Sunday as a day of rest and worship."

The petitioners demurred to the answer, and this appeal is from the order of the Court below overruling the demurrer, and from the judgment in favor of the defendants.

There is no provision in the Charter expressly authorizing the Mayor and City Council of Baltimore to pass the ordinance in question, but section 6 of the Charter (Act of 1898, Chapter 123) declares that the Mayor and City Council of Baltimore shall "have and exercise within the limits of the City of Baltimore all the power commonly known as the Police Power to the same extent as the State has or could exercise said power within said limits." In the case of *Rossberg* v. *State,* 111 Md. 394, JUDGE PEARCE, speaking for this Court, after referring to the broad and comprehensive police powers conferred upon the City, and dealing with the contention of the appellant that the ordinance in question in that case was invalid because it was inconsistent with the law

of the State, said: "But all the text-writers already cited herein unite in declaring that *further and additional penalties* may be imposed by ordinance, without creating inconsistency. The true doctrine, in our opinion, is concisely stated in 28 Cyc. 701, as follows: 'Such ordinances must not directly or indirectly contravene the general law. Hence ordinances which assume directly or indirectly to permit acts or occupations which the State statutes prohibit, or to prohibit acts permitted by statute or Constitution, are under the familiar rule for validity of ordinances uniformly declared to be null and void. Additional regulations by the ordinance does not render it void.'" In *Hiller* v. *State,* 124 Md. 385, JUDGE BURKE said that the ordinance then in force in Baltimore City, and which prohibited the playing of baseball on Sunday, "was passed * * * in the legitimate exercise of the police power" conferred upon the City, and it follows, under the rule clearly and explicitly stated in *Rossberg* v. *State, supra,* that if the ordinance now in question "assumes directly or indirectly to permit acts or occupations which" the statutes of this State prohibit it is null and void. And in passing upon the validity of the ordinance we are to be controlled by what acts may be done under its authority. In the case of *Ulman* v. *Baltimore,* 72 Md. 587, the Court said: "It matters not, upon the question of the constitutionality of such a law, that the assessment has in fact been fairly apportioned. The constitutional validity of law is to be tested, not by what has been done under it, but by what may by its authority be done," and the same tests must be applied to ordinances. *Hagerstown* v. *B. & O. R. R. Co.,* 107 Md. 178; *Curtis* v. *Mactier,* 115 Md. 386, and *Johns Hopkins Bldg. Co.* v. *Baltimore,* 130 Md. 286.

Section 436 of Article 27 of Bagby's Code of the Public General laws of the State (Vol. 3) declares that:

"No person whatsoever shall work or do any bodily labor on the Lord's Day, commonly called Sunday; and no person having children or servants shall com-

mand, or wittingly or willingly suffer any of them to do any manner of work or labor on the Lord's Day (works of necessity and charity always excepted), nor shall suffer or permit any children or servants to profane the Lord's Day by gaming, fishing, fowling, hunting or unlawful pastime or recreation; and every person transgressing this section and being thereof convicted before a justice of the peace shall forfeit five dollars, to be applied to the use of the county."

In 37 Cyc. 541, the author says: "As statutes which designate Sunday as a day of rest and prohibit the doing of specified acts on that day have for their object the promotion of the health, peace and good order of society by requiring man to take a periodical day of rest, they have, from the beginning, been constantly upheld as constitutional on the ground that they are within the domain of the police power. They are essentially civil, and not religious, regulations, whose validity is neither strengthened nor weakened by the fact that the day of rest they enjoin is the Sabbath." It was said by the Supreme Court in *Petit* v. *Minnesota,* 177 U. S. 164: "Upon no subject is there such a concurrence of opinion, among philosophers, moralists and statesmen of all nations, as on the necessity of periodical cessation from labor. One day in seven is the rule, founded in experience, and sustained by science. * * * The prohibition of secular business on Sunday is advocated on the ground that by it the general welfare is advanced, labor protected, and the moral and physical well-being of society promoted." In the case of *State* v. *Fearson,* 2 Md. 310, the Court, in construing the law prohibiting certain things to be done on Sunday said: "We are to regard the act as designing to make that unlawful on Sunday which would be deemed in law as innocent on any other day of the week," and in the case of *Judefind* v. *State,* 78 Md. 510, where Judefind had been arrested and convicted for a violation of the provision of the Code quoted above, the Court, speaking through JUDGE BOYD, said: "Nature, experience

and observation suggests the propriety and necessity of one day of rest, and the day generally adopted is Sunday. "There are, and always will be, honest differences of opinion as to how Sunday should be spent, but the advantages of having a weekly day of rest, from a mere physical and political stand-point, are too apparent to permit us to doubt the propriety of having reasonable laws to regulate work on that day. "In interpreting them, courts must not place unreasonable con-structions upon them. There may be some circumstances under which it would be deemed harsh and severe to punish a man for husking corn on Sunday; but if he defies the laws of the State, or makes himself obnoxious to those desiring the quiet and peace of this day of rest, he should expect the machinery of the law to be put in motion. * * *

"It is undoubtedly true that rest from secular employment on Sunday does have a tendency to foster and encourage the Christian religion—of all sects and denominations that observe that day—as rest from work and ordinary occupation enables many to engage in public worship who probably would not otherwise do so. But it would scarcely be asked of a Court, in what professes to be a Christian land, to declare a law unconstitutional because it requires rest from bodily labor on Sunday (except works of necessity and charity), and thereby promote the cause of Christianity. If the Christian religion is, incidentally or otherwise, benefited or fostered by having this day of rest, as it undoubtedly is, there is all the more reason for the enforcement of laws that help to preserve it. Whilst courts have generally sustined Sunday laws as 'civil regulations,' their decisions will have no less weight if they are shown to be in accordance with divine law as well as human."

In *Barnie's Case*, in the Circuit Court for Frederick County, where the petitioners were brought before JUDGE McSHERRY under two writs of *habeas corpus*, and where the returns to the writ showed that the petitioners were held by the sheriff under warrants issued by a justice of the peace

charging them with a violation of the section of the Code quoted above by playing baseball on Sunday, that learned Judge in disposing of the case said: "Only those persons who paid the price charged for admission were allowed to enter the park during the game: Mr. Tate and the other players were employed by Mr. Barnie at a fixed salary for the baseball season. The playing of baseball during that season is the occupation, pursuit and business of the petitioners; the game was played on the Sunday in question precisely as it was played on any other day. "The petitioners ask to be discharged from custody on the ground that playing baseball on Sunday is not unlawful. Whether it is or is not unlawful depends entirely and exclusively on whether the statute just quoted prohibits it or not. To that statute and that alone recourse must be had for a solution of the pending inquiry. Sunday statutes are essentially civil regulations, providing for a fixed day of rest in the business of the ordinary avocations and the amusements of the community. Periods of rest are absolutely necessary to the well-being of society. They must be established by common consent or fixed by the legislative power of the State. 'In a Christian community where a very large majority of the people celebrate the first day of the week as their chosen period of rest from labor, it is not surprising that that day should have received the legislative sanction; and as it is also devoted to religious observances, we are prepared to estimate the reason why the statute should speak of the Lord's Day, and denominate the infraction of its legalized rest, a profanation. Yet this does not change the character of the enactment. It is still, essentially, a civil regulation, made for the government of man as a member of society. *Specht* v. *Commonwealth,* 8 Pa. 312.' * * * Now what is it that the statute forbids? It prohibits all persons from working or doing any *bodily labor* on a designated day of the week. If the thing which the petitioners were engaged in doing when arrested on Sunday was work or labor, they are within the terms of the statute; other-

wise they are not within the terms, because it is not pretended that the act committed by them falls within any other provision of the Sunday law. * * * What, then, is the meaning of the words, work and *labor,* used in the Sunday statute? Do they mean simple menial service, drudgery, or are they broader in their scope and application? They are not technical words, and, consequently, are to be given their ordinary and natural signification, for in that sense the Legislature is presumed to have employed them. Courts are not warranted in searching out and applying nice refinements and subtle distinctions with respect to the meaning of ordinary words, either for the purpose of excluding a given case from the purview of a statute, or for the purpose of including it therein. Their plain and simple duty is to place a rational, natural and unstrained interpretation upon the language of the act so as to give effect to the obvious intent of the law-makers.

"Webster defines work thus: 'The act of working, toil, labor, travail, *employment,* occupation, operation, exertion.' He further says 'work is a general term for the exertion of the body and mind, and the product of such exertion.' As already stated, playing baseball is the occupation and employment of the petitioners; and if the pursuit of an employment or occupation constitutes work, then playing baseball is doing work, notwithstanding the thing done may be known by some other name. Courts look beneath the surface, often disregarding mere names, in dealing with the substance and essence of things. Baseball playing does not cease to be work by being called a name. It is none the less bodily labor because affording recreation to those who pay to witness it. It is not mere exercise and not intended by those who play it to be exercise. It requires violent bodily exertion, it is resorted to as a means of livelihood, and those who play it on Sunday, *under the conditions stated,* pursue on that day their usual and accustomed occupations. Playing a game does not, it is true, necessarily mean doing work; but, still,

prohibited work may be done in playing a game; and this is precisely the case at bar. * * *

"So here the playing of baseball is the work and labor of the petitioners; and whilst this work may differ in kind from that of the merchant, mechanic or artisan or that of the humble toiler or menial, it is still the work or labor of the baseball player, and its pursuit on Sunday is subversive of that rest from daily avocation which, as a mere police measure, the Legislature has seen fit to prescribe. This seems to me to be the plain and obvious meaning of the statute, and is the only construction which will make the statute effective. "Of course, it will be understood that I am only dealing with the case before me, and all I mean to decide is that the playing of baseball on Sunday under the conditions before set forth is working or doing bodily labor within the meaning of the statute."

We have quoted at length from the opinion of the learned Judge in *Barnie's case* because his construction of the Act prohibiting work and labor on Sunday and its application to the facts of that case are clear and convincing. His reasoning and decision did not rest upon the fact that during the game of baseball a fee was charged for admission to the park, but upon the ground that the game of baseball was the occupation and employment of the petitioners, and the pursuit of that employment and occupation constituted work within the meaning of the statute. It is said in 37 *Cyc.* 544: "The statutes of nearly all jurisdictions prohibit the performance of work and labor in one's ordinary calling on the Sabbath. Under these statutes the words 'ordinary calling' mean that which the ordinary duties of the calling bring into continued action. The words 'labor' and 'laboring' are used in their ordinary sense, and should not receive a strained construction."

Turning now to sub-section B of section 3 of the ordinance, the only restriction as to the playing of the games therein mentioned on Sunday, except the restrictions as to time and

place, is that no admission fee "to such games shall be charged," and the ordinance permits the playing of baseball and the other games referred to on Sunday by professionals and others who may be hired and paid for that purpose and whose occupation and employment may be the playing of such games. If therefore the validity of this section of the ordinance is to be tested by what it assumes to authorize, or by what may be done under its authority it clearly contravenes the provision of the Code which declares that "No person whatsoever shall work or do any bodily labor on the Lord's Day, commonly called Sunday," and is therefore illegal and void under the rule announced by this Court in *Rossberg* v. *State, supra.*

The appellees insist that the petitioners have no standing in Court, and that the relief sought can not be obtained by a writ of mandamus. These contentions are disposed of by the cases of *Pumphrey* v. *Baltimore,* 47 Md. 145 and *Levering* v. *Supervisors, etc.,* 129 Md. 335. In *Pumphrey's* case the Court said: "There is a decided preponderance of American authorities in favor of the doctrine, that private persons may move for a *mandamus,* to enforce a public duty, not due to the government as such, without the intervention of a government law officer." In *Levering's case* the petition for mandamus was filed by Joshua Levering and others, "constituting a Committee of the Lord's Day Alliance, a body corporate," and as individuals and taxpayers of the City of Baltimore, etc., and the prayer of the petition was for a writ of mandamus "directed to the defendant, the Board of Supervisors of Elections of Baltimore City, and each of the members of said board, having its office in the Court House of Baltimore City, preventing and restraining it and them from printing said ordinance upon said official ballots to be used at said general election in said Baltimore City on the said 7th day of November, 1916, and from printing thereon the question of approving or disapproving or adopting or rejecting said alleged ordinance and from submitting said ordinance or said question to the voters of Baltimore City at said general elec-

tion, and further by said writ of mandamus to direct, order and require the said Board of Supervisors of Elections of Baltimore City, the defendant, not to print said alleged ordinance upon said official ballots and not print said question of the approval or disapproval or adoption or rejection of said alleged ordinance upon said official ballots and not to submit said ordinance or said question to the voters of Baltimore City at said general election and ordering such other and further relief as may be proper in the premises." On appeal this Court reversed the order of the Court below dismissing the petition for the writ of mandamus, "and remanded the case to the end that the writ be issued as prayed."

The Charter of the Mayor and City Council of Baltimore confers upon the Board of Park Commissioners "power from time to time to make such rules and regulations for the government and preservation of order within the parks, squares, springs and monuments belonging to, controlled by, or in the custody of the Mayor and City Council of Baltimore, as it may deem expedient." Under this power the board was not authorized to pass a resolution or regulation contrary to the statute law of the State, and as the resolution referred to in this case permits the playing on Sundays, between the hours of 2 and 7 P. M., in the public parks of the city such athletic games as are permitted to be played therein on week days, it falls within the condemnation of the rule stated in reference to Ordinance No. 353.

Sub-section B of section 3 of Ordinance No. 353 is the only section of that ordinance which authorizes the playing of the games therein mentioned in the public parks of the City. If by reason of the fact that that section is void, the remaining sections of the ordinance, including the repealing clause, fall with it under the rule stated in *State* v. *Benzinger,* 83 Md. 481, then section 3 of Article 31 of the Baltimore City Code, which prohibited the playing of games on the Sabbath Day within the limits of the City, remains in force, and the resolution of the Board of Park Commissioners would

be illegal and void under its provisions.    If on the other hand the remaining sections of Ordinance No. 353 are not affected by the invalidity of sub-section B, and sub-section A of section 3 of the ordinance stands, the same result would follow as to the resolution of the board, for sub-section A, like the prior ordinance, prohibits the playing of ball or other games on Sunday within the limits of the City, and sub-section C refers only to the playing of games on Sunday on *"private grounds".*

As the resolution in question is illegal and void for the reasons stated, it is unnecessary to determine whether the resolution and Ordinance No. 353 directly or indirectly contravene the other provisions of Section 436 of Article 27 of the Code of Public General Laws of the State, which declare that "no person having children or servants shall command, or wittingly or willingly suffer any of them to do any manner of work or labor on the Lord's Day (works of necessity and charity always excepted), nor shall suffer or permit any children or servants to profane the Lord's Day by gaming, fishing, fowling, hunting or unlawful pastime or recreation."

It follows from what has been said that the order of Court and judgment appealed from must be reversed, and the case remanded to the end that a writ may be issued as prayed in the petition.

JUDGES BRISCOE and PATTISON, who did not sit in the case, desire me to say that they have examined the record and briefs and read the opinion and concur in the conclusion reached by the Court in this case.

> *Order and judgment reversed, with costs, and case remanded, to the end that the writ be issued as prayed.*