# FROHWERK v. UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF MISSOURI.

No. 685.   Argued January 27, 1919.—Decided March 10, 1919.

The First Amendment, while prohibiting legislation against free speech
as such, was not intended to give immunity to every possible use of
language.   P. 206.

A conspiracy to obstruct recruiting by words of persuasion merely,
viz., by circulating newspaper publications—with overt acts, is
within the Espionage Act of June 15, 1917, and within the power of
Congress to punish.   Pp. 206, 208.   Schenck v. United States, ante, 47.

After conviction under an indictment charging such a conspiracy and,
as overt acts, the circulation of newspapers containing articles which
might well tend to effect its object if circulated in certain places,
the court must assume, in the absence of a bill of exceptions, that
the evidence as to the quarters reached by the newspapers and the
scienter and expectation of the defendant, was sufficient to sustain
the conviction.   P. 208.

A conspiracy to obstruct recruiting in violation of the Espionage Act
is criminal even when no means have been specifically agreed on to
carry out the intent; and hence it is not an objection to an indict-
ment that means are not alleged.   P. 209.

Neither, in such an indictment, is it necessary to allege that false re-
ports were made or intended to be made.   Id.

An allegation that defendants conspired to accomplish an object ne-
cessarily alleges their intent to do so.   Id.

Under § 4 of the Espionage Act of 1917, the overt acts are sufficiently
alleged as done to effect the object of the conspiracy.   Id.

An indictment is not bad for duplicity in setting up in a single count a
conspiracy to commit two offenses; the conspiracy is a unit, how-
ever diverse its objects.   Id.

There is no merit in the suggestion that acts which are not treasonable
cannot be punished under the Espionage Act of 1917, upon the
theory that other acts included in the statute amount to treason and
can only be punished as such.   P. 210.

The amendment of 1918 did not affect indictments found under the
Espionage Act of 1917.   Id.

Abuse of discretion is not established by the facts that, upon overruling a demurrer to an indictment, the District Court on the next day ordered a plea of not guilty to be entered, refused a continuance, empanelled a jury, out of those previously called to meet on that day for the term, and set the trial to begin on the day following. *Id.* Affirmed.

The case is stated in the opinion.

*Mr. Frans E. Lindquist* and *Mr. Joseph D. Shewalter* for plaintiff in error.

*Mr. John Lord O'Brian,* Special Assistant to the Attorney General, with whom *Mr. Alfred Bettman,* Special Assistant to the Attorney General, was on the brief, for the United States.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is an indictment in thirteen counts. The first alleges a conspiracy between the plaintiff in error and one Carl Gleeser, they then being engaged in the preparation and publication of a newspaper, the Missouri Staats Zeitung, to violate the Espionage Act of June 15, 1917, c. 30, § 3, 40 Stat. 217, 219. It alleges as overt acts the preparation and circulation of twelve articles, &c. in the said newspaper at different dates from July 6, 1917, to December 7 of the same year. The other counts allege attempts to cause disloyalty, mutiny and refusal of duty in the military and naval forces of the United States, by the same publications, each count being confined to the publication of a single date. Motion to dismiss and a demurrer on constitutional and other grounds, especially that of the First Amendment as to free speech, were overruled, subject to exception, and the defendant refusing to plead the Court ordered a plea of not guilty to be filed. There was a trial and Frohwerk was found guilty on all

the counts except the seventh, which needs no further mention. He was sentenced to a fine and to ten years imprisonment on each count, the imprisonment on the later counts to run concurrently with that on the first.

Owing to unfortunate differences no bill of exceptions is before us. Frohwerk applied to this Court for leave to file a petition for a writ of mandamus requiring the judge to sign a proper bill of exceptions, but a case was not stated that would warrant the issuing of the writ and leave was denied. *Ex parte Frohwerk*, 248 U. S. 540. The absence of a bill of exceptions and the suggestions in the application for mandamus have caused us to consider the case with more anxiety than if it presented only the constitutional question which was the theme of the principal argument here. With regard to that argument we think it necessary to add to what has been said in *Schenck* v. *United States*, *ante*, 47, only that the First Amendment while prohibiting legislation against free speech as such cannot have been, and obviously was not, intended to give immunity for every possible use of language. *Robertson* v. *Baldwin*, 165 U. S. 275, 281. We venture to believe that neither Hamilton nor Madison, nor any other competent person then or later, ever supposed that to make criminal the counselling of a murder within the jurisdiction of Congress would be an unconstitutional interference with free speech.

Whatever might be thought of the other counts on the evidence, if it were before us, we have decided in *Schenck* v. *United States*, that a person may be convicted of a conspiracy to obstruct recruiting by words of persuasion. The Government argues that on the record the question is narrowed simply to the power of Congress to punish such a conspiracy to obstruct, but we shall take it in favor of the defendant that the publications set forth as overt acts were the only means and, when coupled with the joint activity in producing them, the only evidence of

the conspiracy alleged. Taking it that way, however, so far as the language of the articles goes there is not much to choose between expressions to be found in them and those before us in *Schenck* v. *United States.*

The first begins by declaring it a monumental and inexcusable mistake to send our soldiers to France, says that it comes no doubt from the great trusts, and later that it appears to be outright murder without serving anything practical; speaks of the unconquerable spirit and undiminished strength of the German nation, and characterizes its own discourse as words of warning to the American people. Then comes a letter from one of the counsel who argued here, stating that the present force is a part of the regular army raised illegally; a matter discussed at length in his voluminous brief, on the ground that before its decision to the contrary the Solicitor General misled this Court as to the law. Later, on August 3, came discussion of the causes of the war, laying it to the administration and saying "that a few men and corporations might amass unprecedented fortunes we sold our honor, our very soul," with the usual repetition that we went to war to protect the loans of Wall Street. Later, after more similar discourse, comes "We say therefore, cease firing."

Next, on August 10, after deploring "the draft riots in Oklahoma and elsewhere" in language that might be taken to convey an innuendo of a different sort, it is said that the previous talk about legal remedies is all very well for those who are past the draft age and have no boys to be drafted, and the paper goes on to give a picture, made as moving as the writer was able to make it, of the sufferings of a drafted man, of his then recognizing that his country is not in danger and that he is being sent to a foreign land to fight in a cause that neither he nor any one else knows anything of, and reaching the conviction that this is but a war to protect some rich men's money.

Who then, it is asked, will pronounce a verdict of guilty
upon him if he stops reasoning and follows the first im-
pulse of nature: self-preservation; and further, whether,
while technically he is wrong in his resistance, he is not
more sinned against than sinning; and yet again whether
the guilt of those who voted the unnatural sacrifice is
not greater than the wrong of those who now seek to es-
cape by ill-advised resistance.   On August 17 there is
quoted and applied to our own situation a remark to the
effect that when rulers scheme to use it for their own ag-
grandizement loyalty serves to perpetuate wrong.   On
August 31, with more of the usual discourse, it is said that
the sooner the public wakes up to the fact that we are
led and ruled by England, the better; that our sons, our
taxes and our sacrifices are only in the interest of England.
On September 28 there is a sneering contrast between
Lord Northcliffe and other Englishmen spending many
hundreds of thousands of dollars here to drag us into the
war and Count Bernstorff spending a few thousand to
maintain peace between his own country and us.   Later
follow some compliments to Germany and a statement
that the Central Powers are carrying on a defensive war.
There is much more to the general effect that we are in
the wrong and are giving false and hypocritical reasons
for our course, but the foregoing is enough to indicate the
kind of matter with which we have to deal.

It may be that all this might be said or written even
in time of war in circumstances that would not make it
a crime.   We do not lose our right to condemn either
measures or men because the Country is at war.   It does
not appear that there was any special effort to reach men
who were subject to the draft; and if the evidence should
show that the defendant was a poor man, turning out
copy for Gleeser, his employer, at less than a day laborer's
pay, for Gleeser to use or reject as he saw fit, in a news-
paper of small circulation, there would be a natural in-

clination to test every question of law to be found in the record very thoroughly before upholding the very severe penalty imposed. But we must take the case on the record as it is, and on that record it is impossible to say that it might not have been found that the circulation of the paper was in quarters where a little breath would be enough to kindle a flame and that the fact was known and relied upon by those who sent the paper out. Small compensation would not exonerate the defendant if it were found that he expected the result, even if pay were his chief desire. When we consider that we do not know how strong the Government's evidence may have been we find ourselves unable to say that the articles could not furnish a basis for a conviction upon the first count at least. We pass therefore to the other points that are raised.

It is said that the first count is bad because it does not allege the means by which the conspiracy was to be carried out. But a conspiracy to obstruct recruiting would be criminal even if no means were agreed upon specifically by which to accomplish the intent. It is enough if the parties agreed to set to work for that common purpose. That purpose could be accomplished or aided by persuasion as well as by false statements, and there was no need to allege that false reports were intended to be made or made. It is argued that there is no sufficient allegation of intent, but intent to accomplish an object cannot be alleged more clearly than by stating that parties conspired to accomplish it. The overt acts are alleged to have been done to effect the object of the conspiracy and that is sufficient under § 4 of the Act of 1917. Countenance we believe has been given by some Courts to the notion that a single count in an indictment for conspiring to commit two offences is bad for duplicity. This Court has given it none. *Buckeye Powder Co.* v. *DuPont Powder Co.*, 248 U. S. 55, 60, 61; *Joplin Mercantile Co.* v. *United*

*States,* 236 U. S. 531, 548. The conspiracy is the crime, and that is one, however diverse its objects. Some reference was made in the proceedings and in argument to the provision in the Constitution concerning treason, and it was suggested on the one hand that some of the matters dealt with in the Act of 1917 were treasonable and punishable as treason or not at all, and on the other that the acts complained of not being treason could not be punished. These suggestions seem to us to need no more than to be stated. The amendment of the Act of 1917 in 1918 did not affect the present indictment. *Schenck* v. *United States, supra.* Without pursuing the matter further we are of opinion that the indictment must stand.

Before the demurrer was disposed of the Court had ordered jurymen to be summoned to serve for the April term of the Court and to report for service on June 25, 1918, as of course it might. The demurrer was overruled on June 24, and on the following day the plea of not guilty was ordered to be entered, a continuance was refused, a jury was empanelled and the trial set to begin the next morning. There is nothing before us that makes it possible to say that the judge's discretion was wrongly exercised. Upon the whole case we are driven to the conclusion that the record shows no ground upon which the judgment can be reversed.

*Judgment affirmed.*