HAMMOND, Attorney General, et al. *v.*
LANCASTER, et al.

[No. 107, October Term, 1949.]

464

466

*Decided February 9, 1950.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Hall Hammond, Attorney General, J. Edgar Harvey, Deputy Attorney General,* and *Frank B. Ober,* with whom

were Thomas N. Biddison, City Solicitor of Baltimore, Leroy W. Preston, and Hugo A. Ricciuti, Assistant City Solicitors, on the brief, for the appellants.

I. Duke Avnet and Linwood G. Koger, with whom were Mitchell A. Dubow, Donald G. Murray, Robert P. McGuinn and Bernard Rosen on the brief, for the appellees.

Briefs of amici curiae supporting the appellants were filed by Frank B. Ober for the former members of the State Commission on Subversive Activities; and William F. McDonald and James A. Perrott for the Maryland Committee Against Un-American Activities.

Briefs of amici curiae supporting the appellees were filed by Harold Buchman for the National Union of Marine Cooks and Stewards, C. I. O.; David Rein, Dallas F. Nicholas and Robert J. Silberstein for the National Lawyers Guild; Arnold H. Seixas, Thurgood Marshall and Robert L. Carter for the National Association for the Advancement of Colored People; Jacob J. Edelman and Marshall A. Levin for the Baltimore Federation of Labor and the Baltimore Teachers Union, Local 340; Eugene M. Feinblatt and Donald N. Rothman for the Baltimore Chapter, Americans for Democratic Action, and Joseph I. Paper and Joseph Burke for the Maryland Civil Liberties Committee, Inc.; Isadore B. Terrell for the American Association of Social Workers, Maryland Chapter; William H. Murphy for the National Council of the Arts, Sciences and Professions; Lee Pressman for the International Workers Order; Harold Buchman, James Stewart Martin and John J. Abt for the Progressive Party of Maryland; Nathan Witt for the Food, Tobacco, Agricultural and Allied Workers Union of America, the International Fur and Leather Workers Union, the United Public Workers of America and the International Union of Mine, Mill & Smelter Workers of America; Hilary W. Gans for the Johns Hopkins University Chapter, American Association of University Professors; David Scribner and Basil R. Pollitt for the

United Electrical, Radio & Machine Workers of America; *Maurice Braverman* for the Communist Party of Maryland; and *Ely Albert Castleman* for the Interdenominational Ministerial Alliance.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from an order of the Chancellor, in the Circuit Court No. 2 of Baltimore City, overruling a demurrer to a bill of complaint which challenged the constitutionality of chapter 86, known as the "Subversive Activities Act of 1949," and chapter 310 of the Acts of 1949. The suit was instituted on April 27, 1949, by 6 college professors or teachers, a salesman, 2 physicians and a sculptor. All are alleged to be taxpayers and all but one, citizens and registered voters of the State of Maryland. The proceeding is a class suit brought by the complainants on behalf of themselves and all others similarly situated. The defendants are the Attorney General of Maryland, the Comptroller of the Treasury, the State Treasurer, the State's Attorney of Baltimore City, the Superintendent of the State Police, the Police Commissioner of Baltimore City, the members of the Grand Jury of Baltimore City, the State Employment Commissioner, the President of the City Service Commission of Baltimore, the members of the State Department of Education, the State Superintendent of Schools, the Board of School Commissioners for Baltimore City and the Superintendent of Public Instruction for Baltimore City. All of these defendants are alleged to have duties to perform under the Act. The prayers of the bill are that the Act be declared unconstitutional, that the defendants be enjoined from enforcing any of its provisions, and especially that the Attorney General be enjoined from appointing a special assistant, provided for therein, that the treasury officials be enjoined from making any funds available for enforcement or administration of the Act, and for other or further relief.

Subsequently, by leave of court, additional paragraphs were added to the bill alleging that on May 31, 1949, a

petition for referendum was filed with the Secretary of State containing more than 5000 signatures of Maryland voters, more than 2500 of which were from the counties and more than 2500 from Baltimore City; that on June 15, 1949, additional signatures of voters were filed, making a sum total of 13,063, of which 6,057 were from the counties and 7,006 from Baltimore City.

Chapter 86 added a new article to the Code under the title "Sedition and Subversive Activities." Its general nature may be briefly indicated. After a number of recitals condemning the "World Communist movement" and "other subversive groups", without naming them, the text of the Act first undertakes to define the terms "subversive organization", "foreign subversive organization" and "subversive person". Under the Subtitle "Sedition", it then undertakes to declare that certain acts, or the incitement to commit certain acts, designed to overthrow the government "by revolution, force or violence", shall be felonies, and to provide penalties and disqualifications upon conviction thereof. Certain duties of enforcement are imposed upon the Attorney General, who is directed to appoint a Special Assistant Attorney General "in charge of subversive activities". Under the subtitle "Loyalty", the Act undertakes to require a loyalty oath (or statement subject to the penalties of perjury) of all persons, except "laborers", employed by the State or any political subdivision thereof, and all applicants for employment, and candidates for public office. There are also provisions for discharge of persons found to be "subversive", subject to a right of court review, and a provision that each private institution of learning, as a condition to receiving state aid, shall file a report stating what procedures it has adopted to determine whether it has reasonable grounds to believe that any "subversive persons" are in its employ. The Act contains a broad severability clause. It was approved by the Governor on March 31, 1949, to become effective June 1, 1949, as provided in Section 3 of the Act. Chapter 310, approved April 22, 1949, did not repeal and reenact Chapter 86, but repealed and reenacted Section 3, with amendments,

so as to declare the Act to be an emergency measure, to take effect from the date of its passage.

The Chancellor decided that the Act is unconstitutional on an number of grounds, that may be summarized as follows: A. The Emergency Act (chapter 310) is unconstitutional, (a) because the declaration of emergency in a separate and subsequent amendment is not in accordance with the provisions of the Maryland Constitution, and (b) it is an *ex post facto* law. He disagreed with the complainants' contentions that it created an office and changed the duties of an existing office, which is prohibited by the Maryland Constitution in an emergency measure. He also disagreed with the contentions that the Act deprived the voters of their constitutional right to stay the operation of the Act pending a referendum vote, and that the declaration of an emergency was not made for a valid legislative purpose. B. The criminal provisions of Chapter 86, under the title "Sedition", violate (1) the basic freedoms guaranteed by the First and Fourteenth Amendments to the Federal Constitution, (2) the prohibitions against Bills of Attainder, and (3) the Fourteenth Amendment in that they are too vague and indefinite to satisfy due process. C. The provisions of Chapter 86, under the title "Loyalty", requiring oaths, or statements in the nature of oaths, by candidates for public office, violate Article 37 of the Maryland Declaration of Rights.

We are faced at the outset with the question whether these complainants, or any of them, have a standing to maintain the suit. This is not a mere matter of procedure, but involves a consideration of some of the fundamental concepts of our constitutional law. The American doctrine of judicial review may be considered as a correlative to the doctrine of the separation of powers, and must always be exercised with due regard to the legislative prerogative. There are a number of subordinate rules that tend to limit the scope of review, among the most important of which are the presumption of constitutionality and the rule that courts will not

decide moot or abstract questions, or, in the absence of constitutional mandate, render advisory opinions. See DeTocqueville, Democracy in America, Part First, Chapter VI; Bryce, American Commonwealth, (3rd ed.) Chapter XXIII, pp. 256-259.

In *State v. Shields,* 49 Md. 301, 305, this court, speaking through Judge Miller, said: "The Legislature has never undertaken, even if it would have the power to do so, to confer jurisdiction and require the Court of Appeals to express opinions upon mere moot questions or abstract propositions." The Supreme Court has from its inception taken a similar position. *Hayburn's Case* 2 Dall. 409, 1 L. Ed. 436. In *Alabama State Federation of Labor v. McAdory,* 325 U. S. 450, 461, 65 S. Ct. 1384, 1389, 89 L. Ed. 1725, the court granted *certiorari* in a case brought in the Alabama State court against enforcement officers, for a declaratory judgment adjudicating the constitutionality of an Alabama Act. It was contended that the Act violated rights of free speech, due process and equal protection, and that it was vague and indefinite. The Supreme Court dismissed the writ of *certiorari.* Speaking through Mr. Chief Justice Stone, the court said: "The requirements for a justiciable case or controversy are no less strict in declaratory judgment proceeding than in any other type of suit. * * * This Court is without power to give advisory opinions. * * * It has long been its considered practice not to decide abstract, hypothetical or contingent questions * * * or to decide any constitutional question in advance of the necessity for its decision * * * or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied * * *, or to decide any constitutional question except with reference to the particular facts to which it is to be applied. * * *.

"A law which is constitutional as applied in one manner may, it is true, violate the Constitution when applied in another. * * *. But 'since all contingencies of attempted enforcement cannot be envisioned in advance of those applications' this Court has felt bound to delay passing

on 'the constitutionality of all the separate phases of a comprehensive statute until faced with cases involving particular provisions as specifically applied to persons who claim to be injured'. *Watson v. Buck,* 313 U. S. 387, 402, 61 S. Ct. 962, 967, 85 L. Ed. 1416. All these considerations forbid our deciding here the constitutionality of a State Statute of doubtful construction in advance of its application and construction by the state courts and without reference to some precise set of facts to which it is to be applied." (The above quotation is complete, except that we have omitted the cases cited.) See also *Rescue Army v. Municipal Court,* 331 U. S. 549, 559, 67 S. Ct. 1409, 91 L. Ed. 1666; *Parker v. Los Angeles,* 70 S. Ct. 161, 163, 94 L. Ed. 144, 147; and *Cole v. State of Arkansas,* 70 S. Ct. 172, 175, 94 L. Ed. 155, 160.

In a recent case involving the provisions of the Federal "Hatch Act", *United Public Workers v. Mitchell,* 330 U. S. 75, 89, 67 S. Ct. 556, 564, 91 L. Ed. 754, Mr. Justice Reed, speaking for the court, said: "As is well known, the federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues, 'concrete legal issues, presented in actual cases, not abstractions' are requisite. * * * The power of courts, and ultimately of this Court, to pass upon the constitutionality of acts of Congress arises only when the interest of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough. * * * It would not accord with judicial responsibility to adjudge, in a matter involving constitutionality, between the freedom of the individual and the requirements of public order except when definite rights appear upon the one side and definite prejudicial interferences upon the other. * * * No threat of interference by the Commission with rights of these appellants appears beyond that implied by the existence of the law and the regulations."

Moreover, the general rule is that equity will not interfere to prevent the enforcement of a criminal statute

even though unconstitutional. *Watson v. Buck, supra;* *Spielman Motors Sales Co. v. Dodge,* 295 U. S. 89, 95, 55 S. Ct. 678, 79 L. Ed. 1322; Pomeroy, Equity Jurisprudence (5th ed.) §§ 254, 1361 b. The mere existence of a criminal statute is not such a threat as to present a justiciable controversy. *Alabama State Federation of Labor v. McAdory, supra.*

The appellees contend, however, that they have an interest, as taxpayers, to prevent waste of public funds. They rely particularly upon the case of *Sun Cab Co. v. Cloud,* 162 Md. 419, 426, 159 A. 922, 925. In that case it was held, first, that the question whether a petition for referendum in a state-wide election contained the requisite number of valid signatures, presented a justiciable question which could be conveniently decided in advance of the election, and, second, that taxpayers, in a class suit, had sufficient monetary interest. On the latter point, it was said: "If the subject-matter is at all within the cognizance of a court of equity, as we conclude it is, if that court may be resorted to for prevention of a popular vote which would be void because based upon insufficient petitions, then, according to the settled practice, taxpayers interested in avoiding the waste of funds derived from taxation which would be involved in conducting the void referendum may make application to the court for the remedy". On the other hand, in *Baltimore Retail Liquor Package Stores Ass'n. v. Commissioners* 171 Md. 426, 189 A. 209, 109 A. L. R. 1253, it was held that taxpayers lacked the requisite special interest in the unlawful issuance of licenses to competitors. In *Maryland Theatrical Corporation v. Brennan,* 180 Md. 377, 388, 24 A. 2d 911, 917, Chief Judge Marbury referred to the "well considered rule that the power of the court to pass on the constitutionality of a statute arises from the case before it, and if this is not involved in the case, the court lacks the power. The secondary rule is that litigant cannot urge the invalidity of a statute unless his interests are adversely affected thereby."

In the recent case of *Green v. Garrett*, 192 Md. 52, 58-59, 63 A. 2d 326, 328, involving an alleged diversion of funds by *ultra vires* or illegal action of a municipality, through a lease of the Baltimore Stadium for professional baseball, we pointed out that the complainants had a special interest as taxpayers and also as adjacent residents and property owners. *Cf. Masson v. Reindollar*, 193 Md. 683, 687-688, 69 A. 2d 482, 484; *Castle Farms Dairy Stores v. Lexington Market*, 193 Md. 472, 482, 67 A. 2d 490, 493, and *Matthaei v. Housing Authority*, 177 Md. 506, 510, 9 A. 2d 835.

In *Schneider v. Lansdale*, 191 Md. 317, 322, 61 A. 2d 671, 673, in passing, at the instance of taxpayers and voters, upon the validity of a proposed charter for Montgomery County, to be submitted at a forthcoming election, we noted that a specific question was presented "which would necessarily have arisen after approval by the voters and which could just as conveniently be decided before submission as afterwards." We held that the question was not "contingent" or "moot", and was one that the court "should consider in advance of submission. But in so doing we are deciding none of the questions which conceivably may arise as to the validity, construction or application of various other provisions of the proposed charter or of action taken thereunder."

Other cases may be cited, in which we have recognized the right of taxpayers and voters to raise a question of referability. *Board of Education of Frederick County v. Mayor and Aldermen of Frederick*, 194 Md. 170, 69 A. 2d 912. Indeed, there are some questions under election laws that could not be raised at all if not presented before the election. *Wilkinson v. McGill*, 192 Md. 387, 393, 64 A. 2d 266, 269.

As to the questions relating to the validity of the Emergency Act (chapter 310) we think they are properly before us, in the light of the Maryland cases cited. No objection is made that the Secretary of State or the supervisors of Elections are not parties. If Chapter 310 was validly enacted so as to put Chapter 86 in effect

from the date of passage, it remains in effect from that date, unless subsequently disapproved by the voters, notwithstanding the petition for referendum presented under Article XVI, Section 3 of the Maryland Constitution. If Chapter 310 cannot be held to put Chapter 86 in effect as an emergency measure, the referendum petition would stay the operation of the law until 30 days after a favorable vote upon it.

The Referendum Amendment is, by its own terms, self-executing. It provides that no law shall take effect until the first day of June next after the session of the General Assembly at which it may be passed "unless it contain" a section declaring such law an emergency law, necessary for the immediate preservation of the public health or safety and passed by a yea and nay vote supported by three-fifths of all the members elected to each of the two houses of the General Assembly. It is conceded that Chapter 310 received such a vote. "The Legislature alone has the power to determine whether such an emergency as is contemplated by that section of the Constitution exists. *Culp v. Commissioner of Chestertown*, 154 Md. 620, 623, 141 A. 410, and its determination of that question is not judicially reviewable." *Norris v. Mayor and City Council of Baltimore*, 172 Md. 667, 686, 192 A. 531, 539. We cannot inquire into the legislative motives.

The appellees contend, however, that Chapter 310 did not satisfy constitutional requirements since it did not repeal and reenact Chapter 86 as a whole, but merely amended Section 3 of that Act. We find no merit in that contention. The purpose of Chapter 310, as shown by its title, was to provide "that said Chapter 86 be declared an emergency measure". Cf. *Miggins v. Mallott*, 169 Md. 435, 440, 182 A. 333. To accomplish this purpose, the effective date section of the prior Act was altered from June 1, 1949, to the date of passage. The legal effect was to make Chapter 86 effective on April 22, 1949, when the emergency was declared, rather than on the date originally set. Cf. *Robey v. Broersma*, 181

Md. 325, 343, 26 A. 2d 820, 29 A. 2d 827, 146 A. L. R. 687; *Kelch v. Keehan,* 183 Md. 140, 143, 36 A. 2d 544; and *State Tax Commission v. Potomac Electric Power Co.,* 182 Md. 111, 117, 32 A. 2d 382. We think the amendment was in substantial compliance with the constitutional requirement. Since we hold that Chapter 86 did not become effective, retroactively, to March 31, 1949, the argument that it is an *ex post facto* law requires no discussion.

The Referendum Amendment, Section 2, provides that no measure creating an office, or changing the duty of any officer, shall be enacted as an emergency law. We think, however, that the additional duties imposed upon the Attorney General are well within the general duties of his office under the Constitution. See Article V, section 3 of the Constitution, and Article 32A of the Code. All of his assistants serve "during the pleasure of the Attorney General" (Code, Article 32A, Section 4), and take no oath of office. We think the Chancellor was correct in holding that they are employees and not public officers. *Cf. Buchholtz v. Hill,* 178 Md. 280, 13 A. 2d 348; *State Tax Commission v. Harrington,* 126 Md. 157, 94 A. 537 and *Board of County School Com'rs of Worcester County v. Goldsborough,* 90 Md. 193, 44 A. 1055. We conclude that, upon the adoption of Chapter 310, Chapter 86 became effective on April 22, 1949, as an emergency law and remains in force unless and until repealed by the voters.

We think, however, that none of the other provisions of the Act are properly before us. The only alleged waste of public funds, except in regard to the referendum, is in the expense of enforcing and administering the Act. But we are referred to no Maryland case holding that to be a sufficient interest. On the other hand, the Supreme Court cases clearly indicate that it is beyond our power to adjudicate constitutional issues at the instance of taxpayers not directly affected. None of the complainants have been threatened with prosecution, nor do they allege any facts to indicate that they have vio-

lated, or are about to violate, any of the criminal provisions of the Act.

It can hardly be denied that a statute which makes it a crime to attempt or conspire to overthrow the government by force or violence, or to incite others to do so, or to aid or abet others to do so, is within the legislative power, if the statute or the application of it is limited to conduct, including words, which "seriously and imminently threatens" to overthrow the government by force or violence. *Bridges v. Wixon,* 326 U. S. 135, 165, 65 S. Ct. 1443, 1457, 89 L. Ed. 2103. See also our recent Constitutional Amendment, Article 15, Section 11. In Maryland, such a statute would be unnecessary. The United States has no common law of crime, (United States v. Hudson, 7 Cranch. 32, 3 L. Ed. 259), but in Maryland the common law of criminal conspiracy is still in force. If the present Act is approved by the voters and an accused is convicted under it, it will be time enough to consider the Act, in its application to particular circumstances and a particular defendant, with the aid of the established canons of construction and severability. It would appear that only in such a case would the Supreme Court, as the final arbiter, feel free to exercise its power of review. *Alabama State Federation of Labor v. McAdory, supra.*

In regard to the Loyalty provisions of the Act, none of the complainants is alleged to be a candidate for public office. As taxpayers, they have no interest in what others may be required to do. Hence, there is no justiciable controversy as to the validity of the oath or statement required of candidates. One complainant, Irene Diggs, alleges that she is an employee of a State agency, to whom the Act applies. But she does not allege that she is threatened with discharge, that she has been ordered to take an oath, or that she has refused or will refuse to take it. We think she has not brought herself within the rule laid down in *United Public Workers v. Mitchell, supra.* In that case the court held that the threat implicit in the passage of the Hatch Act was not enough; and

considered its application only in the case of Poole, who alleged that he had engaged in a forbidden activity and had been formally charged with the offense. For these reasons we must decline to pass upon the question whether the State may properly refuse to employ, or discharge, whom it pleases, so long as there is no unconstitutional discrimination shown.

The allegations of the bill do not present any questions relating to State-aided institutions, and the complainants show no injury or threatened injury in this respect.

In declining to pass upon the constitutional validity of Chapter 86 at this stage, we do not intimate that any of its provisions are valid or invalid. Our decision here is necessarily without prejudice to the rights of any person charged or coerced under its provisions to raise any questions, including those argued in this case, that may be pertinent. We merely hold that on the present bill no justiciable case is presented as to the provisions of Chapter 86.

*Decree reversed and bill dismissed, with costs.*

MARBURY, C. J., and COLLINS, J., concurred in the result. MARBURY, C. J., filed the following concurring opinion. COLLINS, J., agreed with the views expressed therein.

I concur in the result in each of these cases, but the reason why I do not simply join with the majority of the Court in approving the opinions should, in all fairness, be stated.

This Court, in many previous cases, has passed upon all sorts of questions in taxpayers' suits. We have been quite liberal in this respect. (See opinion of Chief Judge Bond in *Baltimore Retail, etc., Ass'n. v. Board of Liquor License Commissioners*, 171 Md. 426, 189 A. 209, 109 A. L. R. 1253.) I shall not take the space to enumerate

or discuss these cases, early and late, and the different questions decided, sometimes by holding them within the rights of taxpayers to raise, and sometimes by merely passing or ignoring the point. Many of them are listed in *Travers v. Fogarty,* 187 Md. 348, 50 A. 2d 238, and in *Weinberg v. Kracke,* 189 Md. 275, 55 A. 2d 797. A group of the earlier ones are collected in *Hillman v. Stockett,* 183 Md. 641, 645, 39 A. 2d 803. See in particular, *Levering v. Park Commissioners,* 134 Md. 48, 59, 106 A. 176, 4 A. L. R. 374. Some are mandamus cases, others bills in equity, but the form is immaterial.

It is true that the Supreme Court, in the cases cited in the majority opinion, has discussed the inadvisability of passing upon certain classes of cases, but we are not bound by these decisions as we are by the decisions of the Supreme Court on matters involving the Constitution of the United States. We determine our own procedures, and what we consider a sufficient right in a complainant to bring a suit.

I agree with the majority of the Court in their conclusion as to the validity of the Emergency Act, Chapter 310, and also with their conclusion that Chapter 86 could have been enacted as an emergency law, and became an emergency law after its amendment by Chapter 310. I do not think, however, that we should stop after deciding these points. These cases were very fully argued on all points, and many briefs were filed by interested parties as friends of the Court. Some of the other questions raised, it seems to me, should have been passed upon, and I think sufficient interest in these other questions is shown by the complainants in these cases.

I agree that we should not go to the extent of construing the several penal sections of the statute, and deciding possible objections made to them. These should await prosecutions where the individuals or organizations accused can be heard. We should not, in an advance opinion, foreclose any of the rights of such accused persons. Even those charged with crime cannot, in general, ask an equity court to enjoin criminal prosecutions. All

questions involving the penal provisions of Chapter 86 can be raised in the criminal courts in actual cases on trial there, and they should be left to such courts when and if they are before them in appropriate proceedings.

The Chancellor held that the affidavit required by Section 15 of Chapter 86 is an additional oath of office, and is contrary to Article 37 of the Maryland Declaration of Rights. Section 15 provides that no person can become a candidate for election to public office unless he or she shall file with the certificate of nomination, required by Article 33 of the Annotated Code, an affidavit that he or she is not a subversive person. There is a further provision that no certificate of nomination shall be received by the election officials unless accompanied by such affidavit, and that there shall not be entered upon any ballot or voting machine in any election the name of any person who fails to make such an affidavit.

The people of the State in November, 1948, approved a constitutional amendment, now Article 15, Section 11 which reads "No person who is a member of an organization that advocates the overthrow of the Government of the United States or of the State of Maryland through force or violence shall be eligible to hold any office, be it elective or appointive, or any other position of profit or trust in the Government of or in the administration of the business of this State or of any county, municipality or other political subdivision of this State."

The requirement of Section 15 is a provident enactment to implement the constitutional provision, and to prevent deception of the voters by keeping from them the names of those who could not serve if elected. It has the same general purpose as the sworn statements required by Article 33, Section 53. That purpose is to assure the voters that those whose names appear on the ballots or in the voting machines are, at least, *prima facie* qualified for the offices they seek. It is a method by which the Legislature is executing what has been held to be its inherent power to safeguard elections. *Kenneweg v. Allegany County Commissioners*, 102 Md. 119, 62 A. 249;

482

*Munsell v. Hennegan,* 182 Md. 15, 31 A. 2d 640, 146 A. L. R. 660; *Hennegan v. Geartner,* 186 Md. 551, 47 A. 2d 393.

To say that such a requirement is an additional oath of office in violation of Article 37 of the Maryland Declaration of Rights is to ignore both its purpose and its actual wording. It is not an oath to be taken by those who are elected to office. It is an affidavit required to be made by those who wish their names to go before the voters. If they cannot make the affidavit, they cannot take the prescribed Constitutional oath, (Article 1, Section 6), and what the Legislature has done is to provide means of finding out in advance, from persons who are not yet elected to office, whether they can take that oath and hold office under Article 15, Section 11. The fact that some of those whose names go upon the ballots will be elected, does not make an affidavit, required of them before they have even taken the first step towards holding office, an additional "oath of office".

Since Article 15, Section 11 of the Constitution applies not only to elective but also to appointive offices, the Legislature also considered it advisable to require a written statement, subject to the penalties of perjury, from each appointed employee. Sec. 13. This statement was to be to the effect that he or she was not a subversive person as defined in the statute. Among the complainants in the *Lancaster* case is Irene Diggs, who is a state employee, as a teacher in Morgan College. Although she does not say she will not or cannot make the statement required, the mere fact of her joining in the bill of complaint indicates that she does not think she ought to be required to make it, or possibly that she will lose her position by not making it. Under these circumstances, and in spite of the Supreme Court decision in the Hatch Act case, referred to in the majority opinion, it would seem that she has enough interest to justify us in answering her question. We think she, and other people similarly situated, can be lawfully required to make such a statement. It is an arrogant assumption that a govern-

ment cannot protect itself against the infiltration of those who desire to destroy it by force.

It is also provided by the statute, (Sec. 11) that the appointing or employing officials of the State are permitted to decline to appoint or employ prospective employees if it is found under procedures to be established that there are reasonable grounds to believe such prospective employees are subversive persons. No one has a right to be a public employee. *McAuliffe v. Mayor*, 155 Mass. 516, 29 N. E. 517, (Justice Holmes). No fundamental rights are destroyed by not employing or by not keeping in public employment those who cannot or will not satisfy the appointing authority that they are not subversive persons. The citizens and taxpayers of the State, through their representatives, are entitled to decide who shall work for them and who shall teach in those schools and colleges which are State institutions supported by State funds.

It would seem, also, that in the Frankfeld case, the complainants are entitled to know whether that act is a bill of attainder against them. *Cummings v. Missouri,* 4 Wall. 277, 18 L. Ed. 356; *Anderson v. Baker*, 23 Md. 531. If it is they have a right to have part of it, at least, stricken down. I do not think it is, and I think we should say so.

There is no attempt in Chapter 86 to name any person or organization as coming within its criminal provisions. There is no list of subversive organizations. On the contrary, every protection is afforded every person or organization accused under its provisions. The statement in the preamble that the "Communist Movement" presents a clear and present danger to the government is made only to show a reason for the enactment. It in no way prevents a fair and judicial trial for any one, nor does it condemn unheard the Communist Party or any of those belonging to that party. And the provision in Section 9 that the Grand Jury shall be charged to inquire into the purposes, activities and any other matters "affecting Communism or any related or other subversive

organizations", and the similar provision in Section 6, are merely directions for investigations, and could not be construed to justify the conviction of a Communist organization, without proof that it is, in fact subversive.

There are two schools of thought for the proper way to handle subversive doctrines and activities. One is that people should be allowed freely to express their opinions, even if they go so far as to advocate the overthrow of the government by force. The other school of thought is that freedom of speech guaranteed by the Constitution is not a guarantee to those who seek to destroy that Constitution by force, that such doctrines should not be allowed to be advocated, that those who seek to destroy a government should not participate in it, and, particularly, that those who believe in democracy owe to their children, in their formative years, protection from doctrines which might produce a bloody revolution. This Court does not have to decide between the political philosophies of those two schools of thought. It is not a judicial question, (*Missouri Pac. Ry. v. City of Omaha*, 235 U. S. 121, 35 S. Ct. 82, 59 L. Ed. 157, *Queenside Hills Co. v. Saxl*, 328 U. S. 80, 66 S. Ct. 850, 90 L. Ed. 1096, and it has been decided by the people of this State through the passage of a constitutional amendment, and through the passage by their representatives in the Legislature of the Subversive Activities Act.

Freedom of speech is not absolute. Justice Holmes made that clear in *Schenck v. United States*, 249 U. S. 47, 39 S. Ct. 247, 249, 63 L. Ed. 470, which was an indictment under the Espionage Act. He said "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre, and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force." Other cases so holding are *Frohwerk v. United States*, 249 U. S. 204, 39 S. Ct. 249, 63 L. Ed. 561, *Gitlow v. People of State of New York*, 268 U. S. 652, 45 S. Ct. 625, 69 L. Ed. 1138, *Whitney v. People of State of California*, 274 U. S. 357, 47 S. Ct. 641, 71 L. Ed. 1095, *Chap-*

*linsky v. State of New Hampshire,* 316 U. S. 568, 62 S. Ct. 766, 88 L. Ed. 1031 and *Kovacs v. Cooper,* 336 U. S. 77, 69 S. Ct. 448, 93 L. Ed. 513.

It follows as a necessary corollary that a state has the right to pass restrictive statutes, and this has also been decided in a number of cases. *Gitlow v. New York supra; Whitney v. California supra; De Jonge v. State of Oregon,* 299 U. S. 353, 57 S. Ct. 255, 81 L. Ed. 278; *Bridges v. State of California* 314 U. S. 252, 62 S. Ct. 190, 88 L. Ed. 192, 159 A. L. R. 1346.

In the *Gitlow* case, *supra,* the court said that "Every presumption is to be indulged in favor of the statute". [268 U. S. 652, 45 S. Ct. 631.] In the concurring opinion of Justice Brandeis in the *Whitney* case *supra* (joined in by Justice Holmes) it is stated that the legislative declaration that the act was necessary for the immediate preservation of the public peace and safety [274 U. S. 357, 47 S. Ct. 649] "like the fact that the statute was passed" created a rebuttable presumption that these conditions had been satisfied. Some confusion has been created since these cases by a footnote of Chief Justice Stone in *United States v. Carolene Products,* 304 U. S. 144, 151, 58 S. Ct. 778, 82 L. Ed. 1234, 1241 and by the later case of *Thomas v. Collins,* 323 U. S. 516, 65 S. Ct. 315, 89 L. Ed. 430. Justice Frankfurter in his concurring opinion in the late case of *Kovacs v. Cooper supra,* has endeavored to dispel this confusion. He said that the phrase [336 U. S. 77, 69 S. Ct. 455] "the preferred position of freedom of speech" was mischievous "if it carries the thought, which it may subtly imply, that any law touching communication is infected with presumptive invalidity". He then gives what he calls "a chronological account of the evolution of talk about 'preferred position' ". He concludes this account by the statement that "the claim that any legislation is presumptively unconstitutional which touches the field of the First Amendment * * * *has never commended itself to a majority of this court*". (Emphasis supplied.)

It seems a fair conclusion that there is still a presumption in favor of the validity of such a legislative enactment as Chapter 86, and I think we should say so, always reserving the rights of anyone affected by it to attack it or any of its provisions.

The many decisions mentioned in the briefs and the argument on the "clear and present danger" rule have no bearing on the issues before us. Some of these are *Bridges v. California, supra; Pennekamp v. State of Florida,* 328 U. S. 331, 66 S. Ct. 1029, 90 L. Ed. 1295, 1306; *Craig v. Harney,* 331 U. S. 367, 67 S. Ct. 1249, 91 L. Ed. 1546, all contempt cases followed by us in *Baltimore Radio Show, Inc. v. State,* 193 Md. 300, 67 A. 2d 497, certiorari denied; *Cantwell v. State of Connecticut,* 310 U. S. 296, 60 S. Ct. 900, 84 L. Ed. 1213, 128 A. L. R. 1352; *Chaplinsky v. New Hampshire, supra; Terminiello v. Chicago,* 337 U. S. 1, 69 S. Ct. 894, 93 L. Ed. 1131; *Bridges v. Wixon,* 326 U. S. 135, 65 S. Ct. 1443, 89 L. Ed. 2103; *Thomas v. Collins, supra.* These cases involve actual prosecutions, and the rule is applied as a measure of proof. What the effect of these cases may be in prosecutions under such an act as Chapter 86 is one thing, but it is quite another to say that they affect its validity on its face. Justice Frankfurter has shown otherwise in his "chronological account" above referred to.

This State has stated in the preamble to Chapter 86 that there now exists a clear and present danger to the governments of the nation and of the State, and that the General Assembly, therefore, has caused a study to be made and a program to be formulated by a Commission, and as a result the statute has been proposed. It is not a carelessly thought out enactment. It had been prepared by an intelligent and able Commission, headed by Frank B. Ober, the present President of the Maryland State Bar Association from whom it derives its popular name "The Ober Law". It shows, intrinsically, the result of study of the Supreme Court decisions, and of other similar statutes. It is a serious effort to carry out a policy already established in the State Constitution, and

a policy which the public thought advisable and necessary to combat actual danger to our form of government. We should not create any doubt that the people can adopt such a policy, even if we do not now pass upon all the provisions of the act adopted by their representatives in the Legislature.

It should be added that it is not suggested that the opinions expressed by me are either held by those constituting the majority of the Court or that they are disagreed with by them. They have simply declined to pass upon or discuss these matters, and they may or may not differ with each other and with me as to any or all of them.

Judge COLLINS authorizes me to say that he agrees with the views I have expressed.