**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jerry D. SMITH, Paul D. Smith, and**
**G. Michael Kirchoff,**
**Defendants–Appellants.**

**Nos. 88–3168, 88–3185 and 88–3189.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 26, 1989.

Decided Dec. 4, 1989.

William J. Hardy and Hiram C. Eastland, Jr., Eastland & Hardy, Washington, D.C., for appellant Jerry D. Smith.

Greg M. Devlin, Gordon, Hipperson, Shogan & Devlin, Spokane, Wash., for appellant Paul D. Smith.

Terrence Kellogg, Seattle, Wash., for appellant G. Michael Kirchoff.

John C. Carver and Kurt P. Hermanns, Asst. U.S. Attys., Seattle, Wash., for appellee.

Before FARRIS, NOONAN, and LEAVY, Circuit Judges.

NOONAN, Circuit Judge:

G. Michael Kirchoff, Jerry D. Smith, and Paul D. Smith appeal their convictions of various crimes in connection with the defrauding of Queen City Savings and Loan Association (the Savings and Loan). We affirm the conviction of all three defendants.

## PROCEEDINGS

### 1. *The Indictment*

The two Smiths, who are brothers, Kirchoff and J. Kip Boyd, were charged in count 1 with a conspiracy with four objectives: to defraud the United States and its agency, the Federal Home Loan Bank Board (the Bank Board) by obstructing the Bank Board's function of safeguarding the integrity of the Savings and Loan; to carry out wire fraud upon the Savings and Loan and its wholly-owned subsidiary, Queen City Inc. (QCI); to make false statements to influence the Savings and Loan; and to make false entries on its books and those of QCI, all with the purpose of obtaining money for the Smith brothers, their families and businesses, in violation of 18 U.S.C. § 371.

Counts 2 to 10 charged the Smiths and Kirchoff with specific acts of wire fraud; count 11 charged these defendants and Boyd with a specific act of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Count 12 charged the Smiths with making a false statement to the Savings and Loan in submitting the fraudulent balance sheet of a Smith-controlled company, Can–Am International, Inc. (Can–Am), in violation of 18 U.S.C. §§ 1014 and 2. Count 13 charged the Smiths with making a false statement relating to Can–Am's subordination of a loan from its stockholders, in violation of the same statutes. *Id.* Count 14 charged Kirchoff with making a false entry in the books of the Savings and Loan and QCI, in violation of 18 U.S.C. § 1006 by filing a Borrower's Certification he knew was false, and charged the Smith brothers with aiding and abetting the commission of that offense, in violation of 18 U.S.C. § 2. Count 15 charged the Smiths with a false statement to the Savings and Loan and QCI as to the purchase price of real estate offered as security for one of the loans of the Savings and Loan, in violation of 18 U.S.C. §§ 1014 and 2. Count 16 charged the Smiths, Kirchoff and Boyd with a false statement as to the value of another piece

of real estate offered as security, in violation of the same statutes.

## 2. *The Trial*

The defendants went on trial February 9, 1988. At the conclusion of the government's case-in-chief the district court granted Boyd's motion for a judgment of acquittal. On March 25, 1988, after a trial of seven weeks, the case as to appellants was submitted to the jury, which returned a verdict on April 7, 1988. Paul Smith was convicted on count 14 and acquitted on the other counts with which he was charged. Kirchoff was acquitted on counts 3, 9, 11 and 16 and convicted of conspiracy as charged in count 1, wire fraud as charged in counts 2, 4, 5, 6, 7, 8, and 10 and making a false entry as charged in count 14. Jerry Smith was acquitted on count 13 and convicted of all the other counts with which he was charged.

The district court sentenced Paul Smith to five years probation, Kirchoff to two years imprisonment on each count with the sentences to run concurrently, and Jerry Smith to five years of imprisonment on count 1; to five years of imprisonment on each of counts 2 through 11 and 14, these terms of imprisonment to run concurrently with each other and consecutive to the term of imprisonment for count 1; and to two years of imprisonment on each of counts 12, 15 and 16, these terms to run concurrently with each other and with the terms of imprisonment imposed as to counts 2 through 11 and 14. Jerry Smith was ordered to make restitution to the Federal Savings and Loan Insurance Corporation (FSLIC) in an amount to be determined by the court.

From the judgments of conviction all three defendants appeal.

## FACTS

The Savings and Loan was a state-chartered institution that had done business in Seattle since 1964. Its accounts were insured by FSLIC. By March 1982, it was in serious trouble, plagued by high interest rates on money borrowed and by many loans in default. At this gloomy time Jerry Smith appeared on its horizon.

Jerry Smith had been a highly successful financial operator. In his heyday, 1978–1979, his net worth was between $50 million and $90 million. However, in 1980 his mortgage company in Eastern Washington had collapsed, leaving him in substantial debt. He had plans for making a comeback. The plans included the Savings and Loan. Paul Smith, a builder, was his brother's serviceable tool.

In the Spring of 1982 Jerry Smith presented himself as a potential large borrower from the Savings and Loan and then as a potential purchaser of the institution. In fact he did not have the resources to buy it, but he had a pliable client, a wealthy Canadian investor, Henry J. Block. By May 1982, Smith had persuaded Block to make an offer for the stock of the Savings and Loan. The offer was accepted by the stockholders in June 1982 and Block received approval as the purchaser from the state and federal regulators in the fall of 1982. Smith managed to create the illusion at the Savings and Loan that he and Block had an identical interest.

During the time between Block's tender offer and his taking control, Smith attended board meetings of the Savings and Loan and gave substantial direction as to how to solve its financial problems. He gave the impression to various persons at the Savings and Loan and to those dealing with it that he was in effect the real purchaser of the stock. For example, Smith informed Donald J. Hess, the President of the Savings and Loan, that he eventually would own 50 or 51 percent of the stock that Block acquired. Through the influence he exerted in this fashion and in particular through his influence on Kirchoff, Smith was enabled to carry out his plan of getting money out of the Savings and Loan.

Kirchoff had for many years been the senior vice president of the largest state-chartered thrift in the state of Washington. Because of his experience and expertise, he had been employed by the Federal Home Loan Bank of Seattle in 1980 and 1981 to teach courses in appraisal and underwrit-

ing techniques. He had recently served as a director of Security Savings, a financial institution owned by Smith. In March 1982 he was hired by the Savings and Loan as a consultant to package and sell the properties the institution had acquired as a result of defaulted loans.

With Smith's help Kirchoff began to run the business of QCI and on July 1, 1982 after Block's offer had been accepted, Kirchoff was made president of QCI. He negotiated his salary with Olin Loomis, the chairman of the Savings and Loan and with Jerry Smith. Kirchoff was given a salary higher than that of Hess even though according to Loomis the institution was "not used to that type of salary."

According to Hess, the president of the Savings and Loan, loans arranged through QCI had two features especially attractive to the Savings and Loan: Although QCI was the wholly-owned subsidiary of the Savings and Loan, QCI itself was a mortgage company and, according to Hess, therefore less regulated than the Savings and Loan; and although QCI was a subsidiary, when the Savings and Loan "bought" the loan from it, the Savings and Loan would treat the loan fee owed by the borrower as realized income. The Savings and Loan showed an instant profit, even though the borrower might default and leave the Savings and Loan with a loss. The availability of this accounting trick, apparently not objected to by certified public accountants at the time, operated as an inducement to the Savings and Loan to use QCI and Kirchoff and blinded it to the risks of deception and fraud. Although transactions between a savings and loan association and its affiliate are subject to regulation by the Bank Board under 12 C.F.R. § 584.3, neither the federal regulators nor the state regulators appear to have scrutinized these transactions between QCI and the Savings and Loan carefully.

*The Can-Am Scheme.* With Kirchoff as an inside man and Smith involved both as an advisor and as a borrower, the plan to milk the Savings and Loan unfolded. On March 4, 1982 Smith had arranged the incorporation in Texas of Can-Am with a capital of $1,000. The principal stockholders were his brother Paul and one Paul Roper, who managed the financial affairs of Block. Jerry Smith arranged for Can-Am to apply to the Savings and Loan for a loan to buy and develop property in the Midland-Odessa area of Texas. The terms were highly favorable to the Savings and Loan. The balance sheet of Can-Am presented to the Savings and Loan, after being signed by Paul Smith on May 20, 1982, showed its principal assets as $950,-500 in cash and $2,076,650 as work in progress. Its principal liability was $1 million payable to its stockholders. The $1 million was described by Kirchoff as a loan from Can-Am stockholders. The Savings and Loan requested that the loan be subordinated to the loan the Savings and Loan would make. Paul Smith signed such an agreement—a Priority Agreement and Indemnity—but Roper did not. The Priority Agreement was fraudulent. Paul Smith and Block were reimbursed for all funds they had advanced Can-Am before the Savings and Loan was repaid. In fact, the balance sheet was fraudulent. Can-Am never had a million dollar loan from its stockholders. Its cash at the time the balance sheet was presented was a little over $1,000.

The Savings and Loan proceeded to lend $4.1 million to Can-Am, retaining a portion of the loan as a fee and interest reserved and actually disbursing to Can-Am $3.3 million. Part of that sum was used to buy the property securing the loan. Kirchoff was instrumental in arranging the disbursements without control so that substantial sums ended up to Jerry Smith's benefit. For example, Kirchoff did not follow a policy of disbursing funds only as work was completed. Instead, Jerry Smith would simply call Kirchoff and request funds over the telephone. In one instance, a field inspector had reported that none of the land had been developed. Kirchoff nonetheless took the contrary position and authorized a disbursement. At least $817,-418 of the loan was used by Jerry Smith, his creditors or other corporations he controlled.

*The PDS Skim.* A second loan was arranged by Jerry Smith in late 1982 to PDS Development, Inc. (PDS), a corporation of which Paul Smith was listed as the sole stockholder. The company sought to borrow $3.89 million in order to buy and develop land in the Midland area. Federal and state regulations limited the amount that could be loaned to one borrower to the Savings and Loan's net worth, then between $4–5 million. At the time of the proposed loan Paul Smith was a part owner of Can–Am, and the proposed PDS loan plus the outstanding Can–Am loan would have exceeded the limitation.

To overcome this problem Paul Smith engaged in a sham sale of Can–Am for $10 to one Scott Moore, who gave PDS the right to repurchase Can–Am for $10 at any time within the next two years and agreed not to sell or alienate the stock in any way. After the sham sale Paul Smith on December 27, 1982 executed a "Borrower's Certification" that did not list the outstanding Can–Am loan as one of his obligations to the Savings and Loan.

In addition, the purchase price of the land to be developed was represented on a "Pro Forma" as $3,906,000. This figure was used as the basis of the PDS loan negotiations and in the loan agreement. In fact, however, the actual price of the land was only $1,953,000.

On December 27, 1982 the Savings and Loan actually disbursed $2,236,200 to PDS. Of this amount $878,200 was used personally by Jerry Smith or for the benefit of his creditors and $36,000 went for the benefit of Paul Smith, and the Smith brothers sent their parents $80,000. None of the funds were used to develop the land.

*The Hidden Valley Hideaway.* Jerry Smith also arranged for a loan to the Hidden Valley Joint Venture, another Texas real estate project, in which the Savings and Loan was to put up the capital to purchase real estate in Midland, Texas, and Ramcon Investments, Inc. (Ramcon) was to do the development work. Ramcon, which was owned in part by PDS, had acquired an option to purchase the real estate for $3,240,000 or $2,500 per acre. However,

the Purchaser's Statement presented to the Savings and Loan stated the purchase price as $5,832,000 or $4,500 per acre. The Savings and Loan disbursed close to $1.5 million as its contribution to the joint venture. Of this amount PDS took $777,360 as a finder's fee. As the 1982 loan to PDS illustrated, cash in PDS was cash subject to Jerry Smith's control.

## ISSUES

I. The three defendants contend that the district court improperly instructed the jury. We review their contentions for an abuse of discretion, considering the instructions as a whole and evaluating the adequacy of the entire charge in the context of the whole trial. *United States v. Frazin,* 780 F.2d 1461, 1468 (9th Cir.), *cert. denied,* 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986); *United States v. Marabelles,* 724 F.2d 1374, 1382 (9th Cir.1984).

■ 1. The defendants say, first, that the court should have instructed the jury that the false statements they made had to be "material to the decision or activities of Queen City Savings & Loan on a commitment or loan." The trial court denied this request and simply instructed the jury that the prosecution must show that on the dates charged, "the defendants made, or caused to be made, a material false statement to Queen City Savings and Loan Association."

Going beyond what they requested of the trial court, the defendants argue that their requested instruction comported with the definition of materiality in *Theron v. United States Marshal,* 832 F.2d 492, 496–97 (9th Cir.1987), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988). In *Theron* the court held that "[a] statement concerns a material fact when the statement has the capacity to influence the lending institution." *Id.* But the actual instruction requested by the defendants here did not mention "capacity to influence." The instruction requested was at most a variation of the instruction actually given. Another instruction, which was given, specified that, in order to convict, the jury must

find "that the defendants made the false statements with the specific intent to influence, in any way, the action of Queen City Savings and Loan Association on a loan or loan application." That instruction fully satisfied the requirement that the statements were meant to influence the decisions and activities of the Savings and Loan. The defendants were not entitled to more.

■■■ 2. The defendants contend, secondly, that the trial court misinstructed the jury on count 14 by telling it that it could convict if it found "that the defendant intended that the entry deceive a federally-insured financial institution or public official." The relevant statute specifies that it is a crime to make a false entry "with intent to *defraud* any such institution ... or to *deceive* any officer, auditor, examiner, or agent of any such institution or or of department or agency of the United States...." 18 U.S.C. § 1006. The statute is in the disjunctive. The crime is committed by an act accompanied by an intent to defraud the institution or by an act accompanied by an intent to deceive an officer of the institution or agency of the United States. The defendants' claim that the crime is committed only by intent to defraud is mistaken. The court correctly stated that an act with intent to deceive would constitute the crime.

The defendants are correct that the statute does not make it a crime to deceive a federally-insured institution. The instruction was mistaken by including the institution. There was, however, no objection to the instruction. The error was waived, unless manifest. It was not manifest. In the context of the entire charge the error was harmless. A "misdescription of an element of the offense ... deprives the jury of its factfinding role." *Carella v. California,* — U.S. —, 109 S.Ct. 2419, 2423, 105 L.Ed.2d 218 (1989) (Scalia, J., concurring). But the error is harmless if no rational juror could have found the defendants guilty under the erroneous instruction and not also found them guilty under the correct instruction. *Id.* So here, the jury could not have found an intent to deceive the institution without finding an intent to deceive its officers. There was ample evidence that the defendants intended to deceive officers of the Savings and Loan itself; the mistake in instruction could not have contributed to the defendants' conviction. *See United States v. Malone,* 837 F.2d 670, 672–73 (5th Cir.1988).

■■ 3. Thirdly, the defendants claim that the trial court did not require the jury to agree on the facts necessary to support a verdict of conspiracy. However, instruction number 6 told the jury that it must find that one of the members of a conspiracy committed one of the overt acts charged "with all of you in agreement on which of the overt acts was committed." The jury was also instructed that the conspiracy charged was alleged to have four objectives and that, in order to return a verdict of guilty, "the jury must unanimously agree upon the same objective as having been proved beyond a reasonable doubt." There was no error.

■■ 4. Jerry Smith and Kirchoff contend that the instruction on conspiracy was flawed because it failed to say that they could not be convicted of conspiracy to make a false entry on the books of the Savings and Loan unless they acted with intent to defraud the Savings and Loan. The contention is mistaken. The conspiracy instruction told the jury that it could not find a defendant guilty unless it found that he "joined the conspiracy and did so knowing of the unlawful plan and intending to help carry it out." The instruction followed the *Manual of Model Jury Instructions for the Ninth Circuit,* § 5.01A (1985 ed.). The court later instructed the jury on the particular intent necessary to commit each of the substantive crimes. These instructions adequately advised the jury. The court was not required to give the instructions in the order preferred by the defendants. *See United States v. Wellington,* 754 F.2d 1457, 1463 (9th Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985).

■■ 5. Paul Smith also challenges the jury instruction on aiding and abetting which told the jury that the government

must prove that the defendant "knowingly helped another defendant commit the offense charged in the count; intended to do so; and acted before the crime was completed." The instruction went on to say that it was not enough for the government to show that the defendant "did things that were helpful to the other defendant. The evidence must show beyond a reasonable doubt that the defendant under consideration acted with the knowledge and intention of helping the other person or persons named in the count to commit the offense charged." Paul Smith fastens on the sentence just quoted and argues that it is ambiguous because it could mean that the defendant was guilty if he merely had the intention of helping the other person, rather than sharing the intention that the principal had. Paul Smith buttresses his argument by noting that the jury acquitted him of the other offenses where there was no similar instruction.

The instruction challenged was actually proposed by Paul Smith and his codefendants. Were we to reach the merits, there is not cause for reversal. Error, if there was error, was invited. Review is barred. *United States v. Benny,* 786 F.2d 1410, 1416–17 (9th Cir.), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986).

As the challenged instruction is, with immaterial variation, the same as Ninth Circuit Model Jury Instruction 5.03, we add that, taken as a whole, the instruction is not ambiguous. It requires that the government prove that the defendant "knowingly" helped another defendant commit the crime and intended to do so. It is explicit that helping a defendant does not constitute the crime of aiding and abetting. The objection is without merit.

■ 6. Jerry Smith objects to the instruction on wire fraud that, "[t]o act with intent to defraud means to act knowingly and with the specific intent to cause some financial loss to another, or bring about some financial gain to one's self." He contends that *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) holds that to prove mail fraud requires proof of an intent to deprive the victim of "property or money," and that the wire fraud statute should be similarly construed. The challenged instruction cannot be isolated from the other instructions given. Immediately before this instruction the district court instructed the jury that the government must prove beyond a reasonable doubt that the defendants "made up a plan or scheme to obtain money by false promises or statements." The charge was clearly adequate.

■ II. The defendants contend that the government proved count 14—making a false entry—with evidence of a violation of a civil requirement of Washington law as to the Borrower's Certification. Clearly, evidence of the violation of a civil banking statute may not be introduced to prove a criminal offense. *United States v. Wolf,* 820 F.2d 1499, 1505 (9th Cir.1987), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988). Just as clearly, such a civil statute may be introduced to show a defendant's motive. *Id.* at 1504–05. In this case the civil statute was introduced to show the motive for Paul D. Smith's false statement about his Can–Am obligations. The district court cautioned the jury that the civil banking regulations were offered only as background and as they might bear on the defendants' intent. The evidence was properly admitted.

■ III. The Smiths further argue that they were convicted of aiding and abetting under 18 U.S.C. § 2 but that the crime was "legally impossible." Their argument is that the substantive offense was one under 18 U.S.C. § 1006 which could only be committed by an officer, agent, or employee of an institution whose accounts are insured by FSLIC. The person who made the false entry was Kirchoff. He was an officer of QCI, which was not insured by FSLIC, but he was also an agent and a director of the Savings and Loan. Hence he could have committed the crime, and the Smiths, although not themselves agents of the Savings and Loan, could have aided and abetted him.

The Smiths argue that there are two parts to 18 U.S.C. § 2 and that they were incorrectly charged under section 2(a).

Section 2(a) declares that whoever commits an offense against the United States or aids or abets it "is punishable as a principal." Section 2(b) declares, "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." They argue that (a) applies to aiders and abettors who have the capacity to commit the crime while (b) applies to those who do not have the capacity but do cause another to commit the offense.

We have recently explained that under (a) the government must prove that someone committed the crime and that another person aided and abetted without performing the criminal act himself; the second person is made "a coprincipal with the person who takes the final step and violates a criminal statute." *United States v. Causey*, 835 F.2d 1289, 1291–92 (9th Cir.1987). In contrast, under (b) the government does not need to prove that someone other than the defendant committed the substantive crime but merely that the aider and abettor caused the act to be performed, even though the person who did the wrongful act violated no criminal statute because of the lack of criminal intent or capacity. *Id.* With these distinctions in mind, it is clear that the Smiths' argument fails. The government proved that Kirchoff had committed the crime and that the Smiths, having aided him to do so, became co-principals under 18 U.S.C. § 2(a).

■ IV. Smith and Kirchoff contend that there was an improper and prejudicial joinder in count I of a conspiracy to defraud the United States and a conspiracy to commit the substantive offenses and that therefore count I was both unconstitutionally duplicative and vague. The statute provides, "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, ... each shall be fined ... or imprisoned ... or both." 18 U.S.C. § 371.

The defendants' contention has a certain force. It is a violation of the rules to join two offenses in the same count. Fed.R.

Crim.P. 8(a). In legal parlance, such an indictment is duplicitous.

In the course of holding that there was a variance between the indictment and the proof of a conspiracy, the Fifth Circuit has applied this rule to the conspiracy statute and has stated, "Count I must have charged a conspiracy *either* to 'commit any offense' *or* to 'defraud the United States'; it cannot have charged both." *United States v. Haga*, 821 F.2d 1036, 1043 (5th Cir.1987) (emphasis in original). Accordingly, proof of conspiracy to defraud the United States was held to constitute a fatal variance when the indictment had charged the defendant with conspiracy to commit offenses against the United States. *Id.*

Similarly, in determining whether a defendant had been subjected to double jeopardy, the Tenth Circuit has held that a charge of conspiracy to commit mail fraud was a charge of a crime different from the crime of conspiracy to defraud the United States. *United States v. Thompson*, 814 F.2d 1472 (10th Cir.1987). The court proceeded to follow the rule stated by Justice Sutherland in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1931): "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Pointing out the proof of conspiracy to commit mail fraud requires proof of a fact which conspiracy to defraud the United States does not, the Tenth Circuit held that the defendant had not even raised a colorable claim of double jeopardy when he had been once charged with conspiracy to commit mail fraud and later charged with conspiracy to defraud the United States. The crimes were distinct. *Thompson*, 814 F.2d at 1477.

If *Haga* and *Thompson* are right, it looks as though the defendants in our case have been charged with two different crimes in Count I and that therefore Count I is bad for duplicity.

We, however, reject any implication of *Haga* and *Thompson* that section 371 creates two distinct conspiracy offenses. Although there is no helpful legislative history, the two clauses should be interpreted to establish alternate means of commission, not separate offenses.

Legislative history does not help the government. The conspiracy statute goes back to "An Act to amend existing laws relating to Internal Revenue and for other Purposes," Ch. 169, § 30, 14 Stat. 484 (1867). There is not a single word of explanation as to the purpose of the statute in the entire body of hearings and reports. *See* Goldstein, "Conspiracy to Defraud the United States," 68 Yale L.J. 405, 418 (1959). At first blush it would seem that the conspiracy statute had been directed only at conspiracy to defraud the United States of its revenue. However, this obvious purpose was rejected by the Supreme Court, which noted that it was not unusual for Congress to combine "incongruous legislation" in the same bill. *United States v. Hirsch*, 100 U.S. 33, 35–36, 25 L.Ed. 539 (1879). The Court interpreted the statute as making criminal "every form of conspiracy against the United States, and every form of conspiracy to defraud them." *Id.* at 35. With this authoritative interpretation as a gloss, the statute was effectively cut off from its original context and turned into a law making an agreement to commit any crime against the United States, or to defraud them, the crime punishable under the statute.

What is determinative here is not legislative history but precedent in the cases where duplicity has been the issue presented to the court. The Second Circuit, in an opinion written by Justice Sutherland affirming the conviction of an United States Circuit Judge for conspiracy to defraud the United States and to commit the substantive offense of violation of a criminal statute, held that the count charging the conspiracy was not duplicitous. *United States v. Manton*, 107 F.2d 834, 839 (2d Cir.1938), *cert. denied* 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940). As the author of *Block-burger*, Justice Sutherland must have been aware that a *Blockburger* analysis would

have led to a different result. The District of Columbia Circuit followed *Manton* in rejecting a contention that the conspiracy statute itself describes two offenses; the court affirmed the conviction of a United States Congressman who had been charged in a single count with conspiracy to defraud the United States and to commit specified substantive offenses. *May v. United States*, 175 F.2d 994, 1002 (D.C. Cir.), *cert. denied*, 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949). More recently *Manton* has been followed in affirming the conviction of a United States Senator charged in a single count with conspiracy to defraud the United States and to commit substantive offenses of bribery, receipt of unlawful gratuities, and violation of the conflict-of-interest statute. *United States v. Williams*, 705 F.2d 603, 623–24 (2d Cir.), *cert. denied* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

The rule, indeed, has been enunciated by Chief Justice Stone for a unanimous Supreme Court: "The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.'" *Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942) (*quoting Frohwerk v. United States*, 249 U.S. 204, 210, 39 S.Ct. 249, 252, 63 L.Ed. 561 (1919)). *Braverman* echoes the magisterial statement of Justice Holmes for a unanimous Supreme Court: "Countenance we believe has been given by some courts to the notion that a single count in an indictment for conspiring to commit two offences is bad for duplicity. This Court has given it none." *Frohwerk*, 249 U.S. at 209, 39 S.Ct. at 252. Here the defendants were charged with a conspiracy under separate clauses of the same statute, not two separate statutes. It would be strange to infer that Congress intended to punish twice a conspiracy that violates both clauses. Where a single criminal statute prohibits alternative acts, courts should not infer the legislature's intent to impose multiple punishment. *See Prince v. United States*, 352 U.S. 322, 329, 77 S.Ct. 403, 407, 1 L.Ed.2d 370 (1957). The clause "defraud

the United States" merely expands the scope of the offense by including another object of a conspiracy that might not otherwise be covered by the clause "any offense." The *Braverman* rule applies even when one of the "diverse" objects of the conspiracy includes conduct prohibited by the "defraud" clause of Section 371. In other words, where conspiracy is the charge, the established rule is that a charge of conspiracy to commit more than one offense may be included in a single count without violating the general rule against duplicity. So here, the defendants were properly charged with a single continuing agreement to defraud the United States and to commit the substantive offenses.

V. Jerry Smith contends that the evidence was insufficient to sustain his convictions. On the contrary, there was sufficient evidence that Jerry Smith carried out a scheme to promise the Savings and Loan high loan fees, high interest, and profit-sharing on loans for land development; that Jerry Smith diverted a portion of these loans to his own benefit; that he made or caused to be made false statements to obtain them; that Kirchoff was his co-conspirator operating from within; that Jerry's brother Paul was used by the master conspirator to achieve his end; and that Jerry Smith profited from his fraud by at least $2 million.

 *McNally's* narrow definition of "defraud" does not extend to the conspiracy charge. A conspiracy to defraud the United States under 18 U.S.C. § 371 does not require an agreement to defraud the government of money or property. The statute prohibits *"any* willful impairment of a legitimate function of government, whether or not the improper acts or objective are criminal under another statute." *United States v. Tuohey,* 867 F.2d 534, 537 (9th Cir.1989). The conspirators here conspired both to impair the functions of the Bank Board and to commit specific substantive offenses.

 The major challenge to the sufficiency of the evidence made by Jerry Smith is in the guise of an argument on the jury instruction on materiality. In arguing that the jury was not properly instructed on materiality—an argument we have already found unpersuasive—he, in effect, argues that he did not have an intent to defraud because the Savings and Loan was already aware of the true facts. Thus, for example, he argues that the Savings and Loan knew that the actual purchase price of the security for the loan to PDS was $1,953,000 rather than $3,906,000. Again, for example, he argues that the value of the real estate in the Hidden Valley joint venture was known by the Savings and Loan to be lower than the $5,832,000 value placed on it by mutual agreement.

The apparent thrust of the argument is that the Savings and Loan knew the true facts and, in its eagerness to make the loan, was indifferent to the inaccuracies in the statements presented to it as to the assets of its borrowers or the value of the security they offered. This line of argument, however, is foreclosed by *United States v. Kennedy,* 564 F.2d 1329, 1340–41 (9th Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978), construing the same statute at issue here. It is not necessary to prove that the deceived agency was actually influenced. The one who is seeking to deceive by means of a false statement may not claim that his statements "were not influential or the information not important." *Kay v. United States,* 303 U.S. 1, 6, 58 S.Ct. 468, 471, 82 L.Ed. 607 (1938).

 Conceding that *Kay* and *Kennedy* block this line of attack, Jerry Smith argues that he could not have had the intent to deceive when he knew that the Savings and Loan was aware of the true facts. But this is an argument for the jury. His intent to deceive was before that body. The jury by its verdict found that he possessed the requisite intent.

The evidence supported the verdict. To the extent that Kirchoff was the agent of the Savings and Loan who knew the true facts, his knowledge does not show that the co-conspirators, Smith and Kirchoff himself, did not intend to deceive the Savings and Loan. *See United States v. Ken-*

*nedy*, 564 F.2d at 1340. In the case of the loan to Can–Am the board of directors of the Savings and Loan obviously believed that there was a million dollar loan on Can–Am's books because they asked for its subordination. A reasonable jury could have drawn the conclusion that Jerry Smith intended to deceive the directors. In the case of the loan to PDS the false certification was necessary to comply with governmental regulations. A reasonable jury could have inferred that Smith intended to deceive the officers of the institution, which could only lend if the certification was filed. In the case of the Hidden Valley joint venture, Jerry Smith told Henry Block, at this time the owner of the Savings and Loan, that the "hard cost of the land was $5,832,000." As Block was seeking to know "the actual net cost of the property" to Ramcon, Smith clearly meant to deceive him and his institution.

VI. Kirchoff also objects to the sufficiency of the evidence against him. He failed to move to dismiss the charges against him at the close of his case or at the close of all the evidence and so effectively waived objection to the sufficiency of the evidence. *United States v. Comerford*, 857 F.2d 1323, 1324 (9th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 812, 102 L.Ed.2d 802 (1989). We will, however, review the evidence to prevent a manifest miscarriage of justice and for plain error. *Id.*

 Kirchoff's principal point is that he received no money from the conspiracy. He did, however, have a substantial motive to be a conspirator: he believed that Jerry Smith was the owner of the Savings and Loan and he profited from Smith's patronage in getting to be made head of QCI and in receiving a salary higher than that of Hess. His actual participation in the conspiracy is shown by the many acts already recited under "Facts"; by his keeping Jerry Smith's name out of the files when it would have been a tip-off to regulators; by his concealing loan documents from other personnel at the Savings and Loan; by his failing to check disbursements; and by his use of improper appraisals of real estate which Jerry Smith had arranged.

 VII. Paul Smith, like Kirchoff, objects to the sufficiency of the evidence against him after having waived the objection by his failure to object at the proper time at trial, and again we review for manifest injustice or plain error. Paul undoubtedly put too much trust in his brother and his brother's lawyer. But he signed the false documents Jerry put in front of him knowing that they would be used to get PDS a loan of $3,890,000 from the Savings and Loan. The evidence was sufficient to make him an aider and abettor of the bank officer who filed the false certifications. The mildness of his sentence corresponds to the minor role he had.

 VIII. Kirchoff objects to the trial court's rulings as to references to the government's case for civil fraud brought against the two Smiths, Block and Roper, a suit in which Kirchoff was charged only with negligence. Kirchoff argues that the limitation of cross-examination on the civil case denied him his Sixth Amendment right to confront the witnesses against him. However, the district court did allow the defendants to impeach government witnesses by asking them about their role as defendants in a civil case in order to show a possible bias in their testimony. The district court is not shown to have abused its discretion in its limitations on cross examination.

 IX. Jerry Smith finally challenges his sentence of five years on the conspiracy count. He argues that a substantive violation of 18 U.S.C. § 1014 carries only a term of imprisonment for two years. However, a substantive offense is different from conspiracy to commit the offense. Congress may rightly consider conspiracy more dangerous than the substantive offense itself. *Clune v. United States*, 159 U.S. 590, 594–95, 16 S.Ct. 125, 126–27, 40 L.Ed. 269 (1895). A sentence on the conspiracy count may be longer than that provided for the substantive offense.

AFFIRMED.